## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CENTER FOR PUBLIC INTEGRITY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 06-1644 (RMC)** |
| | ) | |
| **FEDERAL COMMUNICATIONS** | ) | |
| **COMMISSION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## STATEMENT OF MATERIAL FACTS
## FOR WHICH THERE IS NO GENUINE ISSUE

Defendant Federal Communications Commission respectfully submits this Statement of Material Facts as to which there are no genuine disputes in accordance with Local Rule 7(h). The Declaration of Alan I. Feldman ("Feldman Decl."), Acting Chief, Industry Analysis and Technology Division, Wireline Competition Bureau, Federal Communications Commission supports this statement.

1.      By letter dated August 24, 2006, plaintiff submitted a FOIA request to the FCC seeking (1) "[a] database or other similar electronic copy of all records collected with FCC Form 477," and (2) "[a]ll documentation associated with that database." See letter from Drew Clark, Senior Fellow and Project Manager, The Center For Public Integrity, to Shoko B. Hair, FOIA Public Liaison, Office of Managing Director, FCC, Attachment A to Feldman Decl.

2.      Plaintiff's FOIA request was addressed to the incorrect FCC official, and was not received in the FCC's FOIA Control office and forwarded to WCB until August 29, 2006. Id.

3.      The FCC's response was due 20 working days from that date, or by September 27, 2006. See 5 U.S.C. § 552(a)(6)(A).

4.      On September 26, 2006, the FCC's WCB issued a decision denying plaintiff's FOIA request under Exemption 4 because "the requested records contain commercially sensitive, competitive information and…release would cause harm to the entities that submitted the information."  See letter from Kirk S. Burgee, Associate Bureau Chief, WCB, to Drew Clark, Senior Fellow and Project Manager, The Center For Public Integrity, Attachment B to Feldman Decl.

5.      WCB's September 26, 2006 FOIA decision concluded that:

the requested database and associated documentation constitute commercially sensitive, competitive information.  Filers customarily guard this data from their competitors, and release would harm their competitive interests by revealing to competitors their market strategies, their customer identities and counts and where they have deployed their services.  For example, competitors could use this data to decide where to target their service offerings, facilities construction, and marketing, all to the detriment of Form 477 filers.  For these reasons, we conclude that the requested data is protected against disclosure pursuant to FOIA exemption 4.

Id. (footnote in original omitted).

6.      WCB's September 26, 2006 FOIA decision stated further that:

Once the Commission determines that records fall within exemption 4, as we find here, the requester bears the burden of making a "persuasive showing" that its public interest argument outweighs the arguments for withholding the records.  In balancing the public interest argument against the interests underlying protecting the information, the Commission generally has exercised its discretion to release publicly information falling within FOIA Exemption 4 only in very limited circumstances, such as . . . where the Commission has identified a compelling public interest in disclosure."  The Center makes no public interest argument in favor of disclosing the requested documents, and we find no such argument in our precedent; thus, we find that there exists no compelling public interest sufficient to override the interests underlying exemption 4.

Id. (footnotes in original omitted).

7.      WCB's September 26, 2006 FOIA decision explained that plaintiff could file an administrative appeal with the FCC within 30 days.  Id., citing 47 C.F.R. §

2

0.461(j) (requester may seek review of initial FOIA decision by filing an application for review with the Office of General Counsel within 30 days of the date of the decision).

8.      On September 25, 2006, plaintiff filed the instant civil action.  <u>See</u> Complaint.

9.      On October 19, 2006, plaintiff filed an administrative appeal with the FCC of WCB's September 26, 2006 decision. That appeal remains pending.  <u>See</u> letter from Peter Newbatt Smith, Research Editor and Counsel, Center for Public Integrity, to General Counsel, FCC, dated October 19, 2006, Attachment C to Feldman Decl.

10.      On December 12, 2006, WCB released a Public Notice to service providers that submitted Forms 477 to the FCC notifying them that plaintiff seeks public release of their company-specific Form 477 information in this litigation.  <u>See</u> Attachment D to Feldman Decl.

11.      The Telecommunications Act of 1996 ("1996 Act") directs the FCC to take action to open all telecommunications markets to competition, and seeks to promote innovation and investment in those markets by all participants, including new entrants. <u>See</u> <u>Local Competition and Broadband Reporting</u>, CC Docket No. 99-301, Report and Order, 15 FCC Rcd 7717 (2000) ("<u>2000 Data Gathering Order</u>"), at ¶ 2 (2000 WL 426145), citing 47 U.S.C. §§ 151 <u>et</u> <u>seq.</u>, Joint Statement of Managers, S. Conf. Rep. No. 104-230, 104th Cong., 2d Sess., at 1 (1996).

12.      In March 2000, the FCC adopted rules and a standardized form -- FCC Form 477 -- to collect from providers of telecommunications and related services ("service providers" or "filers") information regarding two critical areas of the

communications industry: development of local telephone service competition and the deployment of broadband services.  Id.

13.    The FCC concluded that collecting the Form 477 information would significantly improve its ability to (1) "develop, evaluate, and revise policy in these rapidly changing areas and provide valuable benchmarks for Congress, the Commission, other policy makers, and consumers;" (2) evaluate the Commission's and states' efforts "to reduce economic and operational barriers to entry" into previously monopolized local telecommunications markets; (3) "assess the availability of broadband services such as high-speed Internet access" while encouraging "the deployment of advanced telecommunications capability as [directed by] section 706 of the 1996 Act;" and (4) achieve "the complementary goal reflected in the 1996 Act of reducing government regulation whenever possible."  See 2000 Data Gathering Order at ¶¶ 1-5.

14.    The FCC requires service providers to submit Forms 477 twice per year. See Feldman Decl. at ¶ 8.

15.    If a service provider fails to timely file a Form 477, it may be subject to penalties under sections 502 and 503(b) of the 1996 Act.  See FCC Form 477, Instructions for September 1, 2006 Filing (of data as of 6/30/06), Attachment E to Feldman Decl., at 17.

16.    The Form 477 collects information about broadband connections to end user locations, and about wireline and wireless local telephone services, for individual states. See Feldman Decl. at ¶ 8.

17.    Providers must complete a separate Form 477 for each state in which they conduct business.  Id.

18.     The filings contain detailed and proprietary company-specific data regarding providers' business holdings, practices, strategies and operations in individual state markets, including information about their service offerings and locations and customer types and counts.  <u>See</u> Feldman Decl. at ¶ 12.

9.     Service providers do not customarily disclose the information contained on the Form 477 to outside parties.  <u>Id</u>.

20.     The information contained on the Form 477 would permit providers' competitors to, among other things, gain a competitive advantage by tailoring market strategies to quash nascent competition, protecting particular business areas that are being subjected to increased competition, or deploying facilities to certain business areas in order to defend strongholds.  <u>Id</u>. at ¶ 11.

21.     Even large companies with multi-state operations typically do not include data in their shareholder or SEC reports or other public documents that is as granular as the state-level information contained on the Form 477.  For example, the Form 477 requires local telephone companies to report information about their success in acquiring long-distance service customers in individual states, which is information that such companies typically do not make public.  <u>Id</u>. at ¶ 12.

22.     Between December 31, 1999 and June 30, 2006, there were fourteen filing rounds, during which the FCC received approximately 35,000 Form 477 submissions.  <u>Id</u>. at ¶ 9.

23.     In the June 2006 filing round alone, approximately 1,500 service providers submitted approximately 5,000 Forms 477.  <u>Id</u>. at ¶ 20.

24.     The FCC's Wireline Competition Bureau ("WCB") maintains an electronic database containing the Form 477 information in company-specific form.  Id. at ¶ 34.

25.     For each filing round, the database consists of two major parts: "line count" data and "ZIP Code" data.  See Feldman Decl. at ¶ 34.

26.     Line count data consists essentially of the data that filers report in Parts I through IV of the Form 477, and it is copied from the form and stored line-by-line.  Id. For the line count data, there is one record per Form 477 filing for each round, thus a total of 35,000 records.  Id.

27.     ZIP Code data consists essentially of the data that filers report in Part V of the Form 477.  Id.  These data are divided between ZIP codes in which filers reported serving at least one local telephone service subscriber and ZIP codes in which filers reported serving at least one broadband subscriber.  Id.  With respect to local telephone service, there is one record for each ZIP code that each filer reported.  Id.  With respect to broadband, there is one record for each ZIP code that each filer reported in filing rounds one through eleven (December 1999 through December 2004) and, since June 2005, for each of the nine technologies (e.g., cable modem or DSL) as reported in Part V of the Form 477, there is one record for each ZIP Code that each filer reported.  Id.  Because there are numerous ZIP Codes in each state, there are approximately 4.8 million ZIP Code records in the database.  Id.

28.     Following each semi-annual data collection, the FCC publishes two reports discussing summary statistics derived from the Form 477 data: the High-Speed Services for Internet Access Report (reporting "a snapshot of subscribership" for "[h]igh-speed lines connecting homes and businesses to the Internet"), and the Local

Telephone Competition Report (reporting the "latest data on local telephone service competition in the United States"). <u>Id</u>. at ¶ 10.

29.    The FCC includes only aggregated (non-company specific) summary statistical data in these reports. <u>See</u> <u>2000 Data Gathering Order</u>, 15 FCC Rcd 7717 at ¶ 89; <u>2004 Data Gathering Order</u> 19 FCC Rcd 22340 at ¶ 24 & n.56.

30.    The line count data is aggregated by carrier class (e.g., incumbent local telephone service provider vs. competitive local telephone service provider) and technology (e.g., cable modem vs. DSL), and to the state or national level. <u>See</u> Feldman Decl. at ¶ 11.

31.    The ZIP Code data is aggregated to the state or national level (e.g., percentage of ZIP Codes with competitive local telephone service providers; percentage of ZIP Codes with high-speed cable modem connections in service). Id. Additionally, the information about specific ZIP Codes that the FCC publishes is summarized as the number (as opposed to the names) of the providers that serve any subscribers in a particular 5-digit geographical ZIP Code, and the ZIP Codes with one to three providers are aggregated into a single category. <u>Id</u>. at ¶ 11.

32.    In some cases, even an aggregate figure might reveal company-specific data. Id. For example, if there are only a few companies (e.g., mobile wireless broadband service providers) with subscribers in a particular state, the subscribership data of one of those providers could be readily discerned in part because each company knows its own data. In such cases, the FCC does not report the aggregate figure. <u>Id</u>.

33.    The current version of Form 477 is divided into a cover page and five parts. <u>Id</u>. at ¶ 13.

34.     On the cover page, filers provide their name and contact information, indicate whether they are filing an original or revised form, and indicate whether they are requesting confidential treatment of their Form 477 information.  Id.  Specifically, filers may check a box to request "non-disclosure of some or all of the information…because…the information is privileged and confidential and public disclosure of such information would likely cause substantial harm to the competitive position of the filer."  See Feldman Decl. at ¶ 13.

35.     On Part I of the form, filers report the number of broadband connections provided to end user customers broken out by technology and data-transfer rates, as well as the share (e.g., percentage) of connections provided to residential end users, the share of connections provided over filers' own facilities, and the share of connections for which the filer bills the customer directly.  Id. at ¶ 15.  Also, incumbent local telephone companies and cable system operators report the share of residential end-user premises able to receive the digital subscriber line (xDSL) and cable modem connections that these companies provide in their service areas.  Id.

36.     Part II of the form collects data regarding wireline and fixed wireless local telephone service.  Id. at ¶ 16.  Filers report the total number of lines and wireless channels provided to end users, as well as the share provided to residential end users, the share for which the filer is the presubscribed interstate long distance carrier, the share provided via filers' own facilities, and the shares of lines provided through various types of contracting agreements.  Id.

37.     On Part III of the form, filers report the number of mobile telephony subscribers served and the share of those subscribers that the filer bills directly. Id. at ¶ 17.

38.     Part IV contains space for filers' comments or explanatory notes regarding the data submitted.  Id. at ¶ 18.

39.     Part V of the form collects ZIP Code data – filers report, for each of the technologies deployed, each of the ZIP Codes in which they provide at least one end-user broadband connection.  See Feldman Decl. at ¶ 19.  Filers also report each of the ZIP Codes in which they provide wireline or fixed wireless local telephone service to at least one end user.  Id.

40.     Some filers, rather than checking the box on the Form 477 cover page, separately requested confidentiality of their Form 477 information, either in attachments to their Form 477 submissions or by other means, e.g., by sending an e-mail to the FCC. Id. at ¶ 14.

41.     Even if a filer does not request confidential treatment of its Form 477 data, the FCC's rules permit the Commission to conclude "on its own motion" that such information should not be released to the public.  See 47 C.F.R. § 0.457(d)(2).

42.     In response to a prior FOIA request from another requester (ERS Group) seeking company-specific Form 477 information but more limited in scope than plaintiff's FOIA request, the FCC withheld that information pursuant to FOIA Exemption 4 because it concluded that, based upon filers' requests for confidential treatment, the information was commercially sensitive and would cause filers substantial competitive harm.  The FCC concluded further with respect to ERS' FOIA request "on its own

motion" that, even where a filer did not request confidential treatment of its Form 477 information, the Commission would not disclose that information because data regarding that filer could reveal confidential information regarding the business strategies and operations of other filers that did request confidentiality.  See February 26, 2006 letter from Kirk S. Burgee to Michael J. Doane, ERS Group, Attachment F to Feldman Decl.

43.    Release of Form 477 data of providers that did not request confidentiality can reveal company-specific information about other filers that did request confidentiality because a competitor can cross-reference data from one Form 477 with the aggregate Form 477 data that the FCC publishes in its semi-annual High-Speed Services for Internet Access and Local Telephone Competition reports to discover information regarding the business operations and strategies of an individual filer.  See Feldman Decl at ¶ 33.

44.    The Commission's rules require a requester to make a "persuasive showing" that Exemption 4 materials should be released.  See 47 C.F.R. § 0.457(d)(1).

45.    Service providers have a commercial interest in their Form 477 information because the filings contain detailed and proprietary company-specific data regarding providers' business holdings, practices, strategies, and operations in individual state markets, including information about their service offerings and locations and customer types and counts.  See Feldman Decl at ¶ 12.

46.    The Forms 477 were submitted to the FCC by business entities providing telecommunications and related services to the public.  See 2000 Data Gathering Order.

47.    Commission orders required service providers to submit the Forms 477 to the FCC.  See, e.g., 2000 Data Gathering Order, 15 FCC Rcd 7717 at ¶ 91 (stating that the Form 477 data collection is "mandatory"); 2004 Data Gathering Order.

48.    The FCC created the Form 477 data collection program for the reasons and objectives set forth in paragraphs 11 and 13 above.  See Feldman Decl. at ¶ 21.

49.    The FCC stated that, in order to accomplish the objectives set forth in paragraphs 11 and 13 above through the Form 477 data collection program, it needed "timely and reliable information" and "data of uniform quality and reliability…[because] other publicly available information sources present less than complete pictures of actual conditions and trends in developing local telephone service markets and in the deployment of broadband," and lack "the type of regular, consistent and comprehensive data necessary to illustrate developments in these markets."  See 2000 Data Gathering Order at ¶¶ 1, 14.

50.    Service providers would be reluctant to submit complete and accurate Form 477 information to the FCC if so doing would reveal to competitors detailed and proprietary company-specific data regarding their business strategies and operations.  See Feldman Decl at ¶ 22.

51.    A lack of reliability of this data would impair the FCC's ability to make rational decisions regarding the Form 477 information submitted, thereby undermining the entire purpose of the data collection program and hindering the FCC's ability to fulfill its statutory directives.  Id.

52.    The FCC's WCB, among other things, collects information and provides economic, financial, and technical analyses regarding telecommunications markets, and

develops and recommends policy goals, objectives, and programs for the Commission on matters concerning such markets. Id. at ¶ 1.

53.     WCB has received and assessed numerous submissions from service providers detailing the significant competitive harm that they would suffer from public disclosure of their Form 477 information in company-specific form, e.g., during the rulemaking preceding the 2000 Data Gathering Order that created the Form 477. See Feldman Decl. at ¶¶ 24-25.

54.     Telecommunications is a highly competitive industry in which companies routinely attempt to discover a possible advantage over their competitors. Id. at ¶ 20.

55.     Disclosure of company-specific Form 477 information could harm service providers by allowing their competitors to determine the particular areas where they have or have not been successful in acquiring customers. Id. at ¶ 27. Form 477 filers report line count information at the state level of detail. Access to the company-specific number of connections that a provider has in service in a particular state (as reported on Part I or Part II of the Form 477) could - if those connections are located in only limited areas within a state (as reported on Part V of the Form 477) - allow competitors to target areas in which a provider has identified, through its own efforts, areas of demand for particular services. Id. Such information is more useful to competitors than simply knowing that a provider exists and is merely offering service within a broader geographic area. Id.

56.     For some providers, competitive harm is likely if they have succeeded in acquiring customers in a limited geographic area – perhaps in only parts of the broader geographic area where the provider publicly offers service. Id. at ¶ 28. Such information

could identify the structure of competition (e.g., the relative success rates of individual competitors) in particular states or in areas smaller than a state. Id. For example, if a provider offered broadband services only in one area of a state, and the number of lines it uses to provide service to end users in that area were publicly reported, its competitors could easily determine the number of that provider's customers in that area. Id. If the provider reported a large increase in high-capacity lines in that state while reporting no increase in the number of such lines in a second state, competitors might conclude that the provider had made a strategic decision to focus on competing for broadband customers in the first state rather than the second. See Feldman Decl. at ¶ 28. In response, a competitor who is the incumbent provider serving the first state might decide to step up its own efforts to deploy broadband facilities, while the incumbent provider in the second state might decide that it could afford to delay investments in order to concentrate on competing against the provider in a third location. Id.

57.    The concerns arising from competitors' knowledge about the relative success of service providers in particular geographic areas are heightened by the ability of competitors to combine company-specific Form 477 data with other information. Id. at ¶ 29. For example, combining the numbers of connections in service with publicly available population figures or other information could allow competitors to make specific estimates of a service provider's success rate in acquiring customers in particular states – and, in many cases, in areas smaller than a state. Id.

58.    New entrants into particular geographic areas are likely to be particularly disadvantaged by the release of company-specific Form 477 data. Id. at ¶ 30. Competitors already serving those geographic areas could use the Form 477 data to

identify providers that are in the initial stages of entering their markets and tailor customer retention efforts or "winback" efforts directed at former customers to prevent new entry.  Id.  Such information also could allow additional entrants an unfair "free ride" on the efforts of the first new entrants to identify areas where competition is more likely to be successful.  Id.

59.    Form 477 filers are likely to suffer substantial competitive harm from the disclosure of company-specific data about the technologies they use.  See Feldman Decl at ¶ 31.  The Form 477 data indicate what type of broadband connections – by technology – a particular provider has in service in particular ZIP codes.  Id.  Some technologies (and related characteristics, such as connection speed) are associated with larger business, government, or institutional users.  Id.  The technologies identified as "other traditional wireline" or "optical carrier" on Part I of the Form 477 are examples.  Id.  In some ZIP codes, there are only a few customers likely to subscribe to such services, which could be identified from publicly available information. Id.   For example, some entities are assigned a unique ZIP code, such as the FCC's unique 20554 ZIP code.  Id.  The company-specific Form 477 data thus could enable competitors to identify the largest or most lucrative customers of the Form 477 filer, and target them for competition.  Id.  Moreover, the competitor would know the technology and range of connection speeds used by the Form 477 filer to serve those customers.  Id.  In such cases, the company-specific Form 477 information would enable competitors to design specific competing offers to target individual customers.  Id.

60.    Competitors' access to historical, as well as current, company-specific Form 477 data could harm service providers by giving competitors information about

marketplace trends that would not be otherwise available through legitimate means. <u>Id</u>. at ¶ 32. For example, information about how a provider's number of lines has increased or decreased in a particular area over time provides competitors with insights into how that provider is focusing its investment and marketing efforts. <u>Id</u>. If a provider publicly reported a large increase in the proportion of lines owned rather than leased in a specific state, its strategy to rely more heavily on deployment of its own facilities would be advertised to competitors. <u>See</u> Feldman Decl. at ¶ 32. Such information would be of value in evaluating a new entrant's priorities and developing a strategy to stifle its competitive efforts. <u>Id</u>. Other geographic areas might have less fluctuation in subscribership over time, allowing competitors to make accurate predictions about the subscribership of reporting companies serving such areas. <u>Id</u>.

61. Even if a filer did not request confidentiality, or requested confidentiality regarding only some of its data, release of that filer's data, when associated with publicly available information, could reveal market-specific information about other filers that did request confidential treatment. <u>See</u> Feldman Decl at ¶ 33. The Form 477 summary statistics that the FCC publishes bi-annually in its High-Speed Services for Internet Access and Local Telephone Competition reports include aggregate data from filers who do not request confidential treatment of their data as well as from filers who do request confidentiality. <u>Id</u>. Because these summary statistics are public, releasing the company-specific Form 477 information of filers that did not request confidentiality, or that requested confidentiality regarding only certain parts of their Form 477 submissions, could result in the Form 477 information provided by another filer that did request confidentiality becoming "visible" to its competitors. <u>Id</u>. These reports include

state-specific totals of the number of broadband connections that are in service, for each of several different types of broadband technologies, and information about the number of broadband providers in each geographic Zip Code.  Id.  The association of data from a specific Form 477 with the aggregate published data could render the requested information useful to competitors, who could combine the company-specific and publicly-available information to gain valuable knowledge regarding a filer's business operations which that filer did consider confidential.  See Feldman Decl at ¶ 33.

62.    The Commission's existing Form 477 electronic database was not designed to permit the segregation of non-confidential from confidential data in a comprehensive manner.  Id. at ¶ 36.

63.    Segregating any Form 477 data that filers might not consider confidential would require FCC staff, first, to identify precisely which filers requested confidentiality in each of the fourteen filing rounds to date and, second, to determine the specific items of Form 477 data for which confidentiality was requested.  Id.  This would not address, however, the separate concern regarding Form 477 data for which a filer did not request confidential treatment, but where release of that filer's data could reveal information about other filers that did request confidentiality.  Id.

64.    Identifying the approximately 74 percent of Form 477 submissions in which filers requested confidentiality using the check-box on the Form 477 cover page would be relatively straightforward.  Id. at ¶ 37.

65.    The FCC has no automated means to determine whether a filer's Form 477 was accompanied by a separate request for confidentiality, e.g., in a separate attachment or e-mail.  Id.

66.     With respect to the 74 percent of filers who used the Form 477 check-box, FCC staff would need to review manually all regular mail, e-mail, and attachments that accompanied their submissions in order to ascertain whether the filers attached additional explanations regarding their confidentiality requests.  Id.

67.     In order to determine whether separate confidentiality requests accompanied any of the remaining approximately 26 percent of Form 477 filings in which filers did not check the box on the cover page, FCC staff would have to review manually all regular mail, e-mail, and attachments associated with the 35,000 filings. See Feldman Decl. at ¶ 37.

68.     Among those filers requesting confidential treatment, determining specifically what data the filer considers confidential would require significant additional manual review.  Id. at ¶ 38.

69.     Through the December 2004 Form 477 data, filers that requested confidentiality were directed to include with their filings a redacted copy of the Form 477 filing, in which competitively sensitive information was replaced by "xxxxxx."  Id. However, not all filers requesting confidential treatment provided redacted copies as instructed.  Id.

70.     For three of the eleven filing rounds in which redacted filings were required (June 2002, December 2002 and June 2003), WCB staff transferred redacted filings into a separate electronic database, but that database has not been updated to reflect any revised Forms 477 that those providers may have submitted.  Id.

71.     The database also does not include Form 477 filings in which providers requested confidentiality but did not submit a redacted version of their submission.  Id.

72.    For the remaining eight filing rounds in which redacted filings were required, the redacted filings were never aggregated into a separate consolidated electronic database, and would have to be identified and incorporated into a consolidated database reflecting all updated redacted filings received.  Id.

73.    With respect to the three filing rounds to date for which redacted filings were not required (the semiannual data after December 2004), as well as for earlier filers that failed to provide redacted copies with their filings, the FCC would not be able to determine independently the particular Form 477 data for which a filer requested confidentiality.  See Feldman Decl. at ¶ 39.  FCC staff would thus have to contact each of the filers individually -- in the most recent June 2006 filing round alone, approximately 1,500 providers submitted approximately 5,000 Forms 477.  Id.

74.    Identifying the situation where a filer did not request confidentiality using the Form 477 cover page check-box or separately request confidentiality, but where release of that filer's data could reveal information about other filers that did request confidential treatment, would also be particularly onerous.  Id. at ¶ 40.

75.    The FCC has no automated process for determining when company-specific data subject to confidentiality requests would become visible as a consequence of releasing company-specific data that is not subject to confidentiality requests, when both are incorporated in a published summary statistic.  Id.

76.    FCC staff would have to develop and test special software to examine all Form 477 data incorporated into the summary statistics in the FCC's High-Speed Services for Internet Access Reports and Local Telephone Competition Reports for each of the past seven years.  Id. at ¶ 41.

77.   For the December 2005 Form 477 data alone, the FCC published in its High-Speed Services for Internet Access Report approximately 100 unique national-level summary statistics and over 500 unique state-level summary statistics of broadband line count information, as well as summary statistics of the number of broadband providers who had paying customers in each geographic ZIP Code.  Id.

78.   Also with respect to the December 2005 data, the FCC published in its Local Telephone Competition Report approximately 30 unique national-level summary statistics and approximately 470 unique state-level summary statistics of telephone service information, as well as summary statistics regarding the number of competitive local exchange carriers who had paying customers in each ZIP Code.  See Feldman Decl. at ¶ 41.

79.   Given the contours of plaintiff's FOIA request, the voluminous amount of Form 477 submissions received, the manner in which the FCC publishes and maintains the information, and WCB's staffing availability, the foregoing process would, at best estimate, take several months or more to complete.  Id. at ¶ 42.

Respectfully submitted,


____/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
Assistant United States Attorney



____/s/_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney



____/s/_____
WYNEVA JOHNSON, D.C. Bar #278515
Assistant United States Attorney
555 4th Street, N.W.
Washington, DC 20530
(202) 514-7224


OF COUNSEL:
Michael Krasnow
Attorney
Office of General Counsel
Federal Communications Commission