UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------x
                                                    :
CENTER FOR PUBLIC INTEGRITY                         :
910 17th Street N.W., 7th Floor                     :
Washington, D.C.  20006-2606                        :
                                                    :
                              Plaintiff,            :
                                                    :       **Civil Action No. 06-1644 (RMC)**
                         v.                         :
                                                    :
FEDERAL COMMUNICATIONS                              :
COMMISSION                                          :
445 12th Street, S.W.                               :
Washington, D.C.  20554-0005                        :
                                                    :
                              Defendant.            :
                                                    :
-------------------------------------------------------------x

**BRIEF OF CTIA – THE WIRELESS ASSOCIATION®
AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT FEDERAL COMMUNICATIONS
COMMISSION'S MOTION FOR SUMMARY JUDGMENT**

Theodore Case Whitehouse (D.C. Bar. No. 298331)
Bernard A. Nigro Jr. (D.C. Bar. No. 412347)
Daniel K. Alvarez (D.C. Bar No. 500173)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, D.C.  20006-1238
202.303.1000 (telephone)
202.303.2000 (facsimile)
twhitehouse@willkie.com
bnigro@willkie.com
dalvarez@willkie.com

Michael F. Altschul (D.C. Bar No. 352666)
CTIA – The Wireless Association®
1400 16th Street, N.W. Suite 600
Washington, D.C.  20036
202.736.3248 (telephone)
202.785.8203 (facsimile)

Counsel for
CTIA – The Wireless Association®

Dated:  January 8, 2007

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................... ii

INTRODUCTION ............................................................................................... 1

STATEMENT OF INTEREST OF AMICUS ............................................................ 2

PROCEDURAL AND FACTUAL BACKGROUND.................................................... 4

DISCUSSION .................................................................................................... 6

I.    FOIA EXEMPTION 4 PROTECTS THE FCC FORM 477 DATA SUBMITTED BY
      CTIA'S MEMBERS FROM DISCLOSURE. ..................................................... 6

II.   DISCLOSURE WOULD NOT ONLY CAUSE SUBSTANTIAL HARM TO CTIA
      MEMBERS, BUT IT WOULD ALSO CAUSE SUBSTANTIAL HARM TO
      COMPETITION. ......................................................................................... 12

III.  DISCLOSURE WOULD CONTRAVENE THE FCC'S POLICY AND PRIOR
      ASSURANCES OF CONFIDENTIALITY. ....................................................... 15

CONCLUSION................................................................................................... 16

# TABLE OF AUTHORITIES

## CASES

*Allnet Commc'n Servs., Inc. v. FCC*, 800 F. Supp. 984 (D.D.C. 1992), *aff'd*, No. 92-5351, 1994 U.S. App. LEXIS 40831 (D.C. Cir. May 27, 1994)..........................7,8,12

*Am. Column & Lumber Co. v. United States*, 257 U.S. 377 (1921) ...............................14

*Baker & Hostetler LLP v. United States Dep't of Commerce*, No. 05-5185, 2006 U.S. App. LEXIS 31454 (D.C. Cir. Dec. 22, 2006)........................................7,9,11

*Bartholdi Cable Co. v. FCC*, 114 F.3d 274 (D.C. Cir. 1997)...................................6,7,8

*CNA Fin. Corp. v. Donovan*, 830 F.2d 1132 (D.C. Cir. 1987).......................................6,7

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ....................................................6

*Church of Scientology of Cal. v. IRS*, 792 F.2d 146 (D.C. Cir. 1986)..............................4

*Critical Mass Energy Project v. NRC*, 975 F.2d 871 (D.C. Cir. 1992) ..............................8

*Fisher v. Renegotiation Bd.*, 355 F. Supp. 1171 (D.D.C. 1973).....................................11

*Gulf & W. Indus. v. United States*, 615 F.2d 527 (D.C. Cir. 1979) ..............................9,11

*MCI Telecomms. Corp. v. GSA*, No. 89-0746, 1995 U.S. Dist. LEXIS 22385 (D.D.C. Feb. 27, 1995) .............................................................12

*McDonnell Douglas Corp. v. United States Dep't of the Air Force*, 375 F.3d 1182 (D.C. Cir. 2004) ......................................................7,8,9,11

*McDonnell Douglas Corp. v. Widnall*, 57 F.2d 1162 (D.C. Cir. 1995) ..........................7

*Nat'l Parks & Conservation Ass'n v. Morton*, 351 F. Supp. 404 (D.D.C. 1972), *aff'd in part, rev'd in part on other grounds sub nom. Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673 (D.C. Cir. 1976).................................................11

*Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974) ...........8,9

*Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280 (D.C. Cir. 1983) ...........9

*Qwest Commc'ns Int'l Inc. v. FCC*, 229 F.3d 1172 (D.C. Cir. 2000) ...................7,12,15

*Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1 (1974) ...........................6

\* - Authorities upon which we chiefly rely are marked with an asterisk.

*Sterling Drug Inc. v. FTC, 450 F.2d 698 (D.C. Cir. 1971).................................10,11,15

Todd v. Exxon Corp., 275 F.3d 191 (2d Cir. 2001) ..........................................14

United States v. Container Corp., 393 U.S. 333 (1969) ....................................14

## FCC MATERIAL

Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993;
    Annual Report and Analysis of Competitive Market Conditions with Respect to
    Commercial Mobile Services, 21 F.C.C.R. 10947 (2006) ...........................2,3,9,12,13

In the Matter of Allnet Communications Services, Inc., 5 F.C.C.R. 4878 (1990) ........12

In the Matter of Classical Radio for Connecticut, Inc., 69 F.C.C.2d 1517 (1978).......12

In the Matter of J. David Stoner, 5 F.C.C.R. 6458 (1990) .............................12

In the Matter of Martha H. Platt, 5 F.C.C.R. 5742 (1990)..............................12

In the Matter of National Rural Telephone Cooperative, 5 F.C.C.R. 502 (1990).........12

In the Matter of Pan American Satellite, 4 F.C.C.R. 4586 (1989) ......................12

In the Matter of Texas Community Antennas Co., 66 F.C.C.2d 305 (1977)................12

Local Competition and Broadband Reporting, 15 F.C.C.R. 7717 (2000)..................10

Policy and Rules Concerning Rates for Competitive Common Carrier Services and
    Facilities Authorizations Therefor, 99 F.C.C.2d 1020 (1985)....................14

Policy and Rules Concerning the Interstate, Interexchange Marketplace; Implementation
    of Section 254(g) of the Communications Act of 1934, as Amended, 11 F.C.C.R 20730
    (1996).........................................................................14,15

## STATUTES

*5 U.S.C. § 551(2) (2006) .............................................................8

*5 U.S.C. § 552(b)(4) (2006)..........................................................5,6

*18 U.S.C. § 1905 (2006) .............................................................6

## RULES

47 C.F.R. § 0.457(d) (2006)...........................................................5,6

* - Authorities upon which we chiefly rely are marked with an asterisk.

47 C.F.R. § 0.461(d)(1) (2006) ..................................................................4

47 C.F.R. § 0.461(e) (2006) ......................................................................5

47 C.F.R. § 1.7000 (2006) ........................................................................4

47 C.F.R. § 1.7001 (2006) ......................................................................4,8

47 C.F.R. § 1.7001(d) (2006)................................................................4,15

47 C.F.R. § 1.7001(f) (2006) ....................................................................4

47 C.F.R. § 1.7002 (2006) ......................................................................4,8

47 C.F.R. § 43.11(a) (2006) ......................................................................4

47 C.F.R. § 43.11(e) (2006) ......................................................................4

## CONGRESSIONAL MATERIAL

H.R. Rep. No. 89-1497 (1964) ................................................................15

S. Rep. No. 89-813 (1964)........................................................................10

\* - Authorities upon which we chiefly rely are marked with an asterisk.

## INTRODUCTION

CTIA - The Wireless Association® ("CTIA") is an association whose members would be harmed by the forced disclosure of the confidential and competitively sensitive data sought by Plaintiff. In enacting the Freedom of Information Act ("FOIA") to open administrative processes to the scrutiny of the press and general public, Congress ensured that confidential business data in the hands of the government would be protected from disclosure as provided in FOIA Exemption 4 and the Trade Secrets Act. It is particularly important that these protections be respected where, as here, the data at issue were submitted with the expectation that they would remain confidential and where disclosure would contravene the Federal Communications Commission's ("FCC") express assurances of confidentiality and longstanding policy of protecting such information.

Wireless broadband is a relatively new service in which carriers are investing billions of dollars in different technologies and service offerings in order to compete among themselves and other broadband service providers. It is in precisely this environment that disclosure of the data being sought by Plaintiff would do the most harm. The very uncertainty that underlies Plaintiff's desire for disclosure of the data, the uncertainty about the plans and progress of rivals, drives innovation and competition in the marketplace. Compelled disclosure of the data being sought by Plaintiff would cause substantial harm to the carriers who have made substantial investments in wireless broadband. In addition, it could reduce the incentive to make the substantial long term investments required to develop a competitive marketplace by forcibly revealing competitors' business strategies and their successes and failures.

FOIA provides specific protections for the data sought by Plaintiff. Compelling disclosure of these data would cause substantial harm to CTIA's members and the race by

wireless carriers to provide broadband service in competition among themselves and with other broadband service providers. Accordingly, the Court should grant the FCC's motion for summary judgment.

## STATEMENT OF INTEREST OF AMICUS

CTIA is an international trade association that represents wireless carriers and manufacturers involved in broadband and advanced telecommunications services. Its members include the Nation's largest wireless broadband providers, including Verizon Wireless, T-Mobile USA, Sprint Nextel, and Cingular Wireless, as well as many smaller providers, such as Alaska Communications Systems and Cellular South. CTIA's purpose in filing this brief is to provide an industry perspective on the issues presented in this case and to highlight the serious harm to CTIA's members and the public interest that would result from forced disclosure of the confidential information sought by the Plaintiff.

CTIA's members compete in one of the most dynamic, competitive businesses in the telecommunications industry – wireless services.[1] Members provide a wide range of wireless data services and commercial mobile radio services ("CMRS"). These services include cellular telecommunications, broadband personal communications services ("PCS"), and enhanced specialized mobile radio services ("ESMR"). As the FCC explained in its most recent report on wireless competition, "[s]ervice providers in the mobile telecommunications market . . . compete on many more dimensions other than price, including non-price characteristics such as coverage, call quality, data speeds, and mobile data content."[2]

---

[1] *See, e.g., Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993; Annual Report and Analysis of Competitive Market Conditions with Respect to Commercial Mobile Services*, 21 F.C.C.R. 10947, ¶ 213 (2006) ("CMRS Report") (describing the "robust competition" in wireless services). *Accord id.* (Statement of Chairman Kevin J. Martin) ("This year's Competition Report demonstrates that the competitive marketplace for wireless services is continuing to bring consumers more choice, better services, and lower prices.").

[2] *Id.* ¶ 101.

Wireless broadband is one of the newest and most competitive sectors of the wireless marketplace. Wireless data revenues totaled $6.5 billion in the first six months of 2006, up from $3.8 billion in the first six months of 2005.[3] Over the past year, "carriers have continued to expand and enhance their mobile data offerings."[4] Three of the four "nationwide" wireless carriers have begun to deploy wireless broadband networks using two different types of technologies,[5] and the fourth carrier recently invested over $4 billion to acquire licenses for spectrum that will serve as the foundation for its own wireless broadband network.[6] Numerous other carriers are also developing wireless broadband solutions to compete with existing broadband options.

In proceedings before the FCC, CTIA has consistently explained that the Form 477 data provided by CTIA members are competitively sensitive and should not be disclosed under FOIA. *See, e.g.*, Comments of CTIA – The Wireless Association®, WC Dkt. No. 04-141, at 7 (filed June 28, 2004). For example, CTIA stated that "[a]ny publication of individual company data would seriously compromise carriers' confidentiality and would harm the competitive marketplace." *Id.* As the primary trade association for wireless carriers and manufacturers,

---

[3] *See* CTIA - The Wireless Association®, Wireless Quick Facts, *available at* http://www.ctia.org/research_statistics/index.cfm/AID/10202.

[4] CMRS Report, 21 F.C.C.R. 10947, ¶ 137.

[5] *Id.* ¶ 138

[6] *See* News Release, T-Mobile USA, T-Mobile USA Statement on Conclusion of Bidding in the FCC Auction of Advanced Wireless Services (Sept. 18, 2006), *available at* http://www.t-mobile.com/company/PressReleases_Article.aspx?assetName=Prs_Prs_20060918&title=T-Mobile%20USA%20Statement%20on%20Conclusion%20of%20Bidding%20in%20the%20FCC%20Auction%20of%20Advanced%20Wireless%20Services; News Release, T-Mobile USA, T-Mobile USA Secures Rights from FCC for Auctioned Spectrum (Nov. 30, 2006), *available at* http://www.t-mobile.com/company/PressReleases_Article.aspx?assetName=Prs_Prs_20061130&title=T-Mobile%20USA%20Secures%20Rights%20from%20FCC%20for%20Auctioned%20Spectrum.

CTIA has a substantial interest in protecting its members' extensive investments in confidential

trade secrets and proprietary information.

## PROCEDURAL AND FACTUAL BACKGROUND

Every six months, the FCC requires carriers with broadband connections to file a "Form

477" with the FCC so it can track overall developments in the broadband market. *See* 47 C.F.R.

§ 1.7002 (2006). Form 477 contains highly confidential commercial data – data "concerning the

deployment of advanced telecommunications capability" (*i.e.*, broadband). *Id.* §§ 1.7000,

1.7001(d). In essence, the FCC requires broadband providers to report all of their business sales

statistical data, including detailed end-user data, coverage data, market participation data, and

connection speed data. *See* FCC Form 477, Instructions for Sept. 1, 2006 Filing ("FCC Form

477 Instructions") (attached as Exhibit 1). The FCC uses the data to draft annual reports on "the

deployment of broadband infrastructure and competition." *Id.* at 1 (citing *Local Telephone*

*Competition and Broadband Reporting*, Report and Order, FCC 04-266 (rel. Nov. 12, 2004)).

Form 477 is "mandatory" for all wireless broadband providers. *See* FCC Form 477

Instructions; 47 C.F.R. §§ 1.7001, 1.7002, 43.11(a). "Failure to file the FCC Form 477 in

accordance with the Commission's rules and the instructions to the Form 477 may lead to [an]

enforcement action." 47 C.F.R. §§ 1.7001(f), 43.11(e).

On August 24, 2006, the Center for Public Integrity ("CPI") sent a FOIA request to the

FCC's Public Liaison, Shoko B. Hair. *See* Compl. ¶ 8. In the FOIA request, the CPI sought "all

records collected with FCC Form 477" and "[a]ll documentation associated with [those

records]."[7] *See id.*

---

[7] In sending the FOIA request to the Public Liaison, the CPI failed to comply with the FCC's regulations, which
require organizations to send FOIA requests to the Office of the Managing Director. *See* 47 C.F.R. § 0.461(d)(1);
http://www.fcc.gov/foia; *see also Church of Scientology of Cal. v. IRS*, 792 F.2d 146, 150 (D.C. Cir. 1986) (FOIA
requests must be filed in accordance with the agency's rules) (citing 5 U.S.C. § 552(a)(3)(B)). Under FCC

The CPI filed suit on September 25, 2006. *See id.* ¶¶ 1-10. In filing suit, the CPI sought

disclosure of the same records that it requested from the FCC. *See id.* At the time, the CPI did

not consult with the FCC or file an administrative appeal.

One day after the CPI filed suit, the FCC's Wireline Competition Bureau ("Bureau")

denied the CPI's FOIA request. *See* FCC Letter, FOIA Control No. 2006-493 (Sept. 26, 2006)

("Sept. 26, 2006 FCC Letter") (attached as Exhibit 2). In denying the request, the Bureau

explained that the records "fall within FOIA exemption 4," which protects "trade secrets and

commercial or financial information" from disclosure. *Id.* at 1, 2; *see* 5 U.S.C. § 552(b)(4); 47

C.F.R. § 0.457(d). As the Bureau explained, "the requested records contain commercially

sensitive, competitive information." *See* Sept. 26, 2006 FCC Letter, at 2. Release of the records

"would cause harm to the entities that submitted the requested information." *Id.* For example,

"competitors could use [the] data to decide where to target their service offerings, facilities

construction, and marketing, all to the detriment of Form 477 filers." *Id.* at 3. Accordingly, the

Bureau concluded that FOIA Exemption 4 applied, and it denied the CPI's request. *Id.*

On October 19, 2006, the CPI appealed the Bureau's denial to the FCC.[8] The CPI,

however, did not drop its lawsuit. Realizing that the CPI would continue its lawsuit, the FCC

provided public notice of the CPI's FOIA claim on December 15, 2006.[9] The public notice

---

regulations, when the Office of the Managing Director receives a FOIA request, the Managing Director assigns the
request to the FOIA Control Office, which date-stamps the request and assigns it to the Bureau with custody over
the records sought. 47 C.F.R. § 0.461(e). In this case, the proper Bureau – the Wireline Competition Bureau –
received the FOIA request on August 29, 2006. *See* Sept. 26, 2006 FCC Letter, at 1. Thus, a response was due
within 20 working days from that date – September 27, 2006. *Id.*

[8] *See* CPI Letter, FOIA Control No. 2006-493 (Oct. 19, 2006).

[9] *See* Public Notice to Service Providers Who Filed FCC Form 477s With the Commission and Sought Confidential
Treatment of The Information Submitted (Dec. 15, 2006) (attached as Exhibit 3).

alerted CTIA and its members that the CPI had filed suit seeking release of its members' trade secrets and confidential statistical data.[10]

## DISCUSSION

## I.    FOIA EXEMPTION 4 PROTECTS THE FCC FORM 477 DATA SUBMITTED BY CTIA'S MEMBERS FROM DISCLOSURE.

The Court should uphold the Bureau's decision not to disclose CTIA members' Form 477 data. In enacting FOIA, Congress sought to open "'administrative processes to the scrutiny of the press and general public.'" *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 17 (1974) (citation omitted). Congress, however, did not intend to allow the disclosure of confidential "trade secrets and commercial or financial information" obtained from private parties. 5 U.S.C. § 552(b)(4). Instead, Congress enacted specific confidentiality protections – namely, FOIA Exemption 4 and the Trade Secrets Act – to protect confidential data obtained from private parties. *Id.*; 18 U.S.C. § 1905.

FOIA Exemption 4 allows the FCC to avoid disclosure, and the Trade Secrets Act affirmatively bars disclosure in this case. FOIA Exemption 4 provides that "an agency need not disclose . . . 'trade secrets and *commercial or financial* information [that are] *obtained from a person* and *privileged or confidential*.'" *Bartholdi Cable Co. v. FCC*, 114 F.3d 274, 281 (D.C. Cir. 1997) (citation omitted) (emphasis added). Ordinarily, "the mere fact that information falls within a FOIA exemption does not of itself bar an agency from disclosing the information." *Id.* (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 293 (1979)). Information that falls within FOIA Exemption 4, however, also "comes within the Trade Secrets Act, 18 U.S.C. § 1905, which prohibits the disclosure of, *inter alia*, 'trade secrets' and 'confidential statistical data.'" *Id.* (citing *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1151 (D.C. Cir. 1987)). Thus, when "a party

---

[10] *Id.*

succeeds in demonstrating that its materials fall within Exemption 4, the government is [generally] precluded from releasing the information by virtue of the Trade Secrets Act." *Id.* (quoting *McDonnell Douglas Corp. v. Widnall*, 57 F.2d 1162, 1164 (D.C. Cir. 1995)); *see also McDonnell Douglas Corp. v. United States Dep't of the Air Force*, 375 F.3d 1182, 1185-86 (D.C. Cir. 2004) (explaining that the Trade Secrets Act "effectively prohibits an agency from releasing information subject to [Exemption 4]").[11]   In this case, CTIA members' Form 477 information meets each of the elements of FOIA Exemption 4, and thus the Court should protect the information from disclosure.

*First*, the information provided by CTIA members in Form 477 constitutes "commercial or financial information" within the meaning of FOIA Exemption 4.  *See Allnet Commc'n Servs., Inc. v. FCC*, 800 F. Supp. 984, 988 (D.D.C. 1992), *aff'd*, No. 92-5351, 1994 U.S. App. LEXIS 40831 (D.C. Cir. May 27, 1994).  Under FOIA Exemption 4, the terms "commercial" and "financial" are given "their ordinary meaning." *Id.*  In this case, the market data in Form 477 easily meet the relevant standard because (1) the information describes carriers' commercial operations, and (2) carriers have a commercial interest in the information at issue.  *See id.  See also Baker & Hostetler LLP v. United States Dep't of Commerce*, No. 05-5185, 2006 U.S. App. LEXIS 31454, at *14-*18 (D.C. Cir. Dec. 22, 2006) (finding that letters contained "commercial" information because they described market conditions for companies).

*Second*, the information provided by CTIA members in Form 477 was "obtained from a person" within the meaning of FOIA Exemption 4.  *See Allnet*, 800 F. Supp. at 988.  Under

---

[11] "As the [D.C. Circuit] has previously recounted, Congress recognized 'that increased governmental access to financial records and commercial operations of individuals and entities . . . had to be accompanied by some restraint on the freedom of governmental employees to disseminate such data to third parties.'" *Qwest Commc'ns Int'l Inc. v. FCC*, 229 F.3d 1172, 1177 (D.C. Cir. 2000) (quoting *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1149 n.122 (D.C. Cir. 1987)).

FOIA Exemption 4, the term "person" refers "to a wide range of entities," including "corporations, associations and public or private organizations other than agencies." *Id.*; *see* 5 U.S.C. § 551(2). In this case, telecommunications companies submitted the data in Form 477; these companies constitute "persons" within the meaning of FOIA Exemption 4. *See Allnet*, 800 F. Supp. at 988.

   *Third*, the information provided by CTIA members in Form 477 is "confidential" within the meaning of FOIA Exemption 4. The test as to whether information is "confidential" depends on "whether the information was voluntarily or involuntarily disclosed to the government." *Bartholdi Cable*, 114 F.3d at 281. "If the information was voluntarily disclosed to the government, it will be considered confidential 'if it is of a kind that would customarily not be released to the public by the person from whom it was obtained.'" *Id.* (quoting *Critical Mass Energy Project v. NRC*, 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc)). If "the information was obtained under compulsion, it will be considered confidential . . . 'if disclosure . . . is likely to have either of the following effects:  (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.'" *Id.* (quoting *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974)).

   In this case, the FCC requires every carrier with broadband connections to complete a Form 477 biannually. *See* 47 C.F.R. §§ 1.7001, 1.7002. Accordingly, the test provided in *National Parks & Conservation Association v. Morton* should apply. *See McDonnell Douglas Corp.*, 375 F.3d at 1187. In *National Parks*, the D.C. Circuit held that information is considered "confidential" and therefore within the scope of Exemption 4 "if it is required to be submitted to the Government and if its disclosure is 'likely . . . to cause substantial harm to the competitive

position of the person from whom the information was obtained.'" *Id.* (quoting *Nat'l Parks & Conservation Ass'n*, 498 F.2d at 770). The party invoking Exemption 4 does *not* have to prove that disclosure "certainly would cause it substantial competitive harm" – it only has to prove that disclosure would "likely" do so. *Id.*; *see Nat'l Parks & Conservation Ass'n*, 498 F.2d at 770; *Gulf & W. Indus. v. United States*, 615 F.2d 527, 530 (D.C. Cir. 1979). Moreover, a party does not have to show "actual competitive harm." *Gulf & W. Indus.*, 615 F.2d at 530. "[A]ctual competition and the likelihood of substantial competitive injury is all that need be shown." *Id.*

This case undoubtedly involves "actual competition": wireless broadband companies actively compete with each other and with other broadband service providers in providing advanced telecommunications services to customers. *See id.* *See, e.g., Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993; Annual Report and Analysis of Competitive Market Conditions with Respect to Commercial Mobile Services*, 21 F.C.C.R. 10947, ¶ 213 (2006) ("CMRS Report") (describing the "robust competition" in the wireless broadband marketplace). Moreover, disclosure would "likely" cause substantial competitive harm to CTIA members. *See McDonnell Douglas Corp.*, 375 F.3d at 1187 (requiring only that disclosure would "likely" cause substantial competitive harm to companies). Form 477 includes statistical data describing companies' exact market conditions; thus, disclosure "would help rivals to identify and exploit those companies' competitive weaknesses." *Baker & Hostetler*, 2006 U.S. App. LEXIS 31454, at *18 (citing *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)). As the Wireline Competition Bureau letter explains, "[f]ilers customarily guard this data from their competitors, and release would harm their competitive interests by revealing to competitors their market strategies, their customer identities and counts[,] and where they have deployed their services." *See* Sept. 26, 2006 FCC Letter, at 3.

Release of the data would allow rival companies to undercut competitors' market strategies, target specified competitors' customers, and target weaknesses in competitors' markets. *See id.*

Form 477 specifically includes three types of statistical data that (among others) would particularly cause substantial harm to CTIA members if released: (1) the states and zip codes where carriers offer broadband services (*i.e.*, market participation data), (2) the number and type of end users that a carrier serves in each state (*i.e.*, end-user data), and (3) the speed of the carriers' connections in each state (*i.e.*, connection speed data). *See* FCC Form 477 Instructions.

Market participation data and end-user data are highly sensitive. Release of the data would cause CTIA members substantial harm. As the FCC recognized when it adopted the original Form 477, the disclosure of market participation and end-user data could be used against the party submitting the information, particularly in the case of a smaller carrier or a new entrant, by allowing competitors to allocate resources and "tailor market strategies to quash nascent competition, protect areas that are being subjected to increased competition, or deploy facilities to defend strongholds." *See Local Competition and Broadband Reporting*, 15 F.C.C.R. 7717, 7758, ¶ 88 (2000). Similarly, release of larger companies' data would allow smaller companies to target less competitive markets and tailor their product offerings against particular competitors. *See* Sept. 26, 2006 FCC Letter, at 3. The data are highly detailed; no comparable information exists in the public domain. *See* FCC Form 477 Instructions. Accordingly, release of the data would impose substantial adverse effects on competitors, and FOIA Exemption 4 applies. *Accord Sterling Drug Inc. v. FTC*, 450 F.2d 698, 709 (D.C. Cir. 1971) (blocking disclosure of data on market shares and business sales statistics under FOIA Exemption 4); S. Rep. No. 89-813, at 9 (1964) (explaining that business sales statistics and customer lists fall within the scope of FOIA Exemption 4).

Connection speed data are also highly confidential, and thus also fall within the scope of

FOIA Exemption 4.  Again, no other comparable information exists in the public domain, and

disclosure would prove particularly harmful to CTIA members.  *See* Sept. 26, 2006 FCC Letter,

at 3.  Connection speed is one of the most important competitive factors for broadband providers.

Disclosure would allow competitors to take specific, directed action to the detriment of parties

submitting the information.  *See id.*  With knowledge of CTIA members' connection speeds,

broadband competitors could harm CTIA members by (1) targeting a handful of states or

regions, and (2) providing slightly better connection speeds there than provided by CTIA

members.  Competitors could also advertise a comparison of the connection speeds in the

relevant regions, thus making it more difficult for new entrants to establish themselves in the

market.

Courts have routinely denied the release of sensitive commercial information that would

help rivals target competitors' market weaknesses.  *See, e.g., Baker & Hostetler*, 2006 U.S. App.

LEXIS 31454, at *18 (finding that certain letters fell within the scope of FOIA Exemption 4

because they described market conditions and would help rivals identify and exploit competitors'

competitive weaknesses); *McDonnell Douglas Corp.*, 375 F.3d at 1187-90 (finding that

disclosure of option year prices would likely cause substantial competitive harm and thus fell

within the scope of FOIA Exemption 4); *Gulf & W. Indus.*, 615 F.2d at 530 (finding that an

agency audit report fell within the scope of FOIA Exemption 4).[12]  Courts have especially been

---

[12] Under the *National Parks* standard, courts have found FOIA Exemption 4 applicable to similar documents, including:  sales and profit data, breakdowns of sales, market share data, and confidential bid amounts, *Sterling Drug, Inc. v. FTC*, 450 F.2d 698, 709 (D.C. Cir. 1971); business sales statistics, including total net sales, total costs and expenses, operating costs, and renegotiable sales, *Fisher v. Renegotiation Bd.*, 355 F. Supp. 1171, 1174 (D.D.C. 1973); and results of audits of books, including sales statistics, inventories, holdings expenses, statement of profits and gross receipts, securities, liabilities, and employee salaries and bonuses, *Nat'l Parks & Conservation Ass'n v. Morton*, 351 F. Supp. 404, 405-06 (D.D.C. 1972), *aff'd in part, rev'd in part on other grounds sub nom. Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673 (D.C. Cir. 1976).

hesitant to allow disclosure of similar, confidential market data in the telecommunications

context. *See, e.g., Allnet*, 800 F. Supp. at 986-90 (finding that computer model information and

"associated data," including "output reports and data," fell within the scope of FOIA Exemption

4); *Qwest Commc'ns Int'l Inc. v. FCC*, 229 F.3d 1172, 1173-84 (D.C. Cir. 2000) (finding that

detailed raw audit data fell within the scope of FOIA Exemption 4); *MCI Telecomms. Corp. v.

GSA*, No. 89-0746, 1995 U.S. Dist. LEXIS 22385, at *4-*12 (D.D.C. Feb. 27, 1995) (finding that

FOIA Exemption 4 applied to pricing data contained in a federal telecommunications system).[13]

Accordingly, the Court should protect the data from disclosure and grant the FCC's

motion for summary judgment.

## II.    DISCLOSURE WOULD NOT ONLY CAUSE SUBSTANTIAL HARM TO CTIA MEMBERS, BUT IT WOULD ALSO CAUSE SUBSTANTIAL HARM TO COMPETITION.

Disclosure of CTIA members' Form 477 data would not only harm CTIA members, but it

would also cause harm to *competition*. Wireless broadband represents the most recent major

development in the telecommunications industry. Differences in providers' technological

capabilities are among the primary factors driving the competitive rivalry that exists in the

wireless marketplace.[14] The importance of technology, combined with uncertainty over rivals'

---

[13] The FCC has likewise protected similar information and data under FOIA Exemption 4. *See, e.g., In the Matter of Texas Community Antennas Co.*, 66 F.C.C.2d 305 (1977) (finding that FCC Form 324s, which contained financial reports submitted in confidence, fell within the scope of FOIA Exemption 4); *In the Matter of Allnet Communications Services, Inc.*, 5 F.C.C.R. 4878 (1990) (finding that an audit report fell within the scope of FOIA Exemption 4); *In the Matter of J. David Stoner*, 5 F.C.C.R. 6458 (1990) (finding that internal documents on telephone companies' procurement practices fell within the scope of FOIA Exemption 4); *In the Matter of National Rural Telephone Cooperative*, 5 F.C.C.R. 502 (1990) (finding that contracts between satellite carriers and home satellite dish distributors fell within the scope of FOIA Exemption 4); *In the Matter of Martha H. Platt*, 5 F.C.C.R. 5742 (1990) (finding that audit reports fell within the scope of FOIA Exemption 4); *In the Matter of Pan American Satellite*, 4 F.C.C.R. 4586 (1989) (finding that a document concerning the estimated costs of satellite transmission paths submitted to the FCC fell within the scope of FOIA Exemption 4); *In the Matter of Classical Radio for Connecticut, Inc. and WTIC-FM Listeners' Guild*, 69 F.C.C.2d 1517 (1978) (finding that mandatory annual financial reports submitted to FCC in confidence fell within the scope of FOIA Exemption 4).

[14] CMRS Report, 21 F.C.C.R. 10947, ¶ 101.

own technological capabilities, has spurred massive investment and innovation in wireless broadband networks. In 2006, analysts estimate that carriers invested some $126 billion on the most recent "generation" of wireless networks – generally referred to as "3G" networks.[15] These networks vary substantially from carrier to carrier with different protocols, handsets, spectrum assets, and other technologies.[16] These carriers are also investing in even newer technologies to try to "leapfrog" their competition and offer better, unique services. For example, Sprint Nextel has announced its intention to deploy a "4G" network using WiMAX technologies to provide wireless broadband services.[17] Uncertainty drives these market developments: uncertainty about which technologies, pricing policies, and product designs attract the most consumers has led to increased innovation and product differentiation in wireless broadband services – innovation that substantially benefits consumers in the long run.

In a market in which competition is spurred by uncertainty about the plans and progress of rivals, the disclosure of CTIA members' Form 477 data would likely harm competition and consumers. For example, a carrier that knows the speeds at which its competitors provide wireless broadband connections may have less incentive to make the investments necessary to produce the kind of groundbreaking innovations and services that would differentiate itself in the marketplace. Instead, the carrier may take only the minimum steps necessary to allow it to claim some small differentiating factor, such as marginally faster service.

In addition, carriers may be hesitant to invest in new technologies where their competitors would immediately know the results of product testing in particular states from

---

[15] *See* Brad Smith, *G-Whiz & More*, Wireless Week, at 7 (Jan. 1, 2007).

[16] *See* CMRS Report, 21 F.C.C.R. 10947, ¶ 138 (noting that Verizon Wireless and Sprint Nextel use EV-DO technologies to deliver wireless broadband, while Cingular uses an HSDPA technology).

[17] *See G-Whiz & More*, Wireless Week, at 7.

publicized end-user data.  Competitors could simply provide "copy-cat" versions of the same

technology to head off competition.  Accordingly, the disclosure of CTIA members' Form 477

data would harm competition by lessening the reward for developing new wireless technologies,

and it would also harm consumers by discouraging those companies from investing in new

technologies in the first place.

If Form 477 data are released, wireless services may quickly become homogenized – a

result that would hurt competition by lessening the potential for innovation.  If released, Form

477 data would put pressure on carriers to gravitate toward wireless technologies that more

quickly attract the most customers.  Thus, instead of risking a substantial investment in unique or

innovative services, carriers may simply provide the services that have proven the most

successful in the market.[18]

In sum, disclosure of CTIA members' Form 477 data would harm carriers, significantly

reduce the potential for innovation, and eliminate the uncertainty on which competitive rivalry in

the marketplace depends.[19]

---

[18] Transparency amongst competitors also could harm consumers by increasing the potential for market
coordination, which would similarly undermine innovation and competition in the marketplace.  *See, e.g., United
States v. Container Corp. of Am.*, 393 U.S. 333, 334-38 (1969) (explaining that information exchanges can facilitate
coordination and create the potential for harming consumers, stabilizing prices, and reducing competition); *Am.
Column & Lumber Co. v. United States*, 257 U.S. 377, 411-12 (1921) (holding that certain information sharing
violated the antitrust laws and led to higher prices); *Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) (allowing
antitrust claim challenging information sharing by competitors).

[19] In other contexts, the FCC has recognized that certain amounts of uncertainty in a competitive marketplace are
beneficial to competition.  For example, in 1996 the FCC established a mandatory detariffing regime for
nondominant interexchange carriers, expecting that such forbearance would "promote competition in the market for
such services."  *See Policy and Rules Concerning the Interstate, Interexchange Marketplace; Implementation of
Section 254(g) of the Communications Act of 1934, as Amended*, 11 F.C.C.R. 20730, 20760, ¶ 53 (1996) ("*Policy
and Rules Concerning the Interstate, Interexchange Marketplace*"); *see also Policy and Rules Concerning Rates for
Competitive Common Carrier Services and Facilities Authorizations Therefor*, 99 F.C.C.2d 1020, 1030, ¶ 13 (1985).
The FCC reasoned that general knowledge of the information contained in the tariffs "impedes vigorous competition
in the market for such services by:  (1) removing incentives for competitive price discounting; (2) reducing or taking
away carriers' ability to make rapid, efficient responses to changes in demand and cost; (3) imposing costs on
carriers that attempt to make new offerings; and (4) preventing consumers from seeking out or obtaining service
arrangements specifically tailored to their needs."  *Policy and Rules Concerning the Interstate, Interexchange
Marketplace*, 11 F.C.C.R. at 20760, ¶ 53.  The FCC also concluded that "tacit coordination of prices for interstate,

**III.    DISCLOSURE WOULD CONTRAVENE THE FCC'S POLICY AND PRIOR ASSURANCES OF CONFIDENTIALITY.**

Finally, disclosure of CTIA members' Form 477 data would contravene the FCC's policy and prior assurances of confidentiality.  For years, the FCC has conditioned submission of Form 477 data on the ability of companies to "make requests for Commission non-disclosure . . . by so indicating on Form 477 at the time that the subject data are submitted."  47 C.F.R. § 1.7001(d).  CTIA's members have indicated their desire to keep their Form 477 data confidential.

As the D.C. Circuit and the House Report to FOIA explain, FOIA Exemption 4 protects "information which is given to an agency in confidence, since a citizen must be able to confide in his Government."  *Sterling Drug*, 450 F.2d at 709 (quoting H.R. Rep. No. 89-1497, at 10 (1964)).  In this case, the documents concern business sales; the companies have affirmatively "sought to prevent public disclosure"; and the "Commission has agreed to treat them as confidential."  *Id*.  Accordingly, the documents should be "exempt from disclosure under the Freedom of Information Act."[20]  *Id.* at 709-10.

---

domestic, interexchange services, to the extent it exists, will be more difficult if we eliminate tariffs, because price and service information about such services provided by nondominant interexchange carriers would no longer be collected and available in one central location."  *Id.*  As in the detariffing context, disclosure of sensitive commercial Form 477 data would impede vigorous competition in the market for broadband services.

[20] Indeed, in similar circumstances, the D.C. Circuit has also found an agency's disclosure of data in contravention of its confidentiality policy "arbitrary and capricious" where it failed to provide an adequate explanation.  *See Qwest*, 229 F.3d at 1180-84.

## CONCLUSION

For the foregoing reasons, the Court should uphold the Bureau's decision and protect

Form 477 data from disclosure under FOIA.


Respectfully submitted,


Theodore Case Whitehouse (D.C. Bar. No. 298331)
Bernard A. Nigro Jr. (D.C. Bar No. 412347)
Daniel K. Alvarez (D.C. Bar No. 500173)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, D.C.  20006-1238
202.303.1000 (telephone)
202.303.2000 (facsimile)
twhitehouse@willkie.com
bnigro@willkie.com
dalvarez@willkie.com

Michael F. Altschul (D.C. Bar No. 352666)
CTIA – The Wireless Association®
1400 16th Street, NW Suite 600
Washington, D.C.  20036
202.736.3248 (telephone)
202.785.8203 (facsimile)

Dated:  January 8, 2007                   Counsel for
                                          CTIA – The Wireless Association®