Exhibit 1 to<br>
Intervenor-Defendants'<br>
Memorandum In Support of<br>
Summary Judgment

# Joint AT&T Declaration

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CENTER FOR PUBLIC INTEGRITY,

    Plaintiff,

    v.

FEDERAL COMMUNICATIONS COMMISSION,

    Defendant.

Civil Action No. 06-01644 (RMC)

## JOINT DECLARATION OF MARK KEIFFER, ROBERT W. QUINN, JR., AND RICK WELDAY, JR.

1. My name is Mark Keiffer. My business address is One AT&T Way, Bedminster, NJ. I am employed by AT&T as Chief Marketing Officer - Business. In this position, I am responsible for marketing activities in support of the Business Segment. This includes Segment Marketing, Product Management, Global Pricing, Global Sales Enablement, Marketing Communications & Operations, Strategy & Business Development, and Global Access Management. I am responsible in part for paragraphs 4 and 8-10 of this declaration with respect to business services markets.

2. My name is Robert W. Quinn, Jr. My business address is 1120 20th St., NW, Washington, D.C., 20036. I am employed by AT&T as Senior Vice President-Federal Regulatory. In this position, I am responsible for regulatory matters affecting AT&T and its affiliates pending before the Federal Communications Commission as well as the coordination and support of regulatory and external affairs activities throughout AT&T's regional operations. I am responsible in whole or in part for paragraphs 4 and 5-7 of this declaration.

3. My name is Rick Welday, Jr. My business address is 175 E. Houston St., San Antonio, TX. I am employed by AT&T as Chief Marketing Officer - Consumer. In this position,

I am responsible for marketing activities in support of the Consumer Segment. This includes Consumer Channel Distribution Strategy and Effectiveness, Consumer Offer Strategy and Consumer Product Management and Marketing. I am responsible in part for paragraphs 4 and 8-10 of this declaration with respect to consumer services markets.

4. The purpose of this declaration is to explain the competitive harm that would result from the public disclosure of the confidential information disclosed to the FCC in the semiannual Form 477.

### Description of the Form 477

5. The Form 477 collects information in three basic categories: broadband, wireless, and local telephony. Each category includes information that is commercially sensitive, that is not ordinarily disclosed to the public, and that, if disclosed, would pose a threat of substantial competitive injury.

6. The broadband information is collected primarily in Part I of the Form. Part I.A. collects information on (i) the total connections provided to end users at "broadband" speed (more than 200 kilobits per second ("kbps") in at least one direction); (ii) the percentage of those connections provided to residential locations; (iii) the percentage of those connections provided over the provider's own last-mile facilities; (iv) the percentage of connections billed to end users; and (v) the percentage of connections provided to residential end user premises broken down by speed. This information must be broken down by the various categories of broadband technology, including asymmetric xDSL, symmetric xDSL, traditional high-capacity wireline technology, cable modem, fiber to the end user, satellite, terrestrial fixed wireless, terrestrial mobile wireless, electric power line, and "[a]ll other technologies." In addition, Part I.B of the Form requires ILECs and cable providers to report the estimated percentage of residential end

2

user premises to which broadband connections could be provided using existing loop facilities. Finally, Part V requires the service provider to list, by type of broadband connection, all 5-digit zip codes in which it provides broadband service.

7. Local telephony information is collected in Part II of the Form. There, carriers must disclose, first, the number of voice grade telephone lines provisioned to end user customers. Of this aggregate number, providers must indicate the percentage (i) that are residential lines; (ii) for which the filer is the presubscribed interstate long distance carrier; (iii) that are residential lines and for which the filer is the presubscribed interstate long distance carrier; (iv) that are provided over unbundled network element ("UNE") loops without UNE switching; (v) that are provided over UNE loops with UNE switching; (vi) that are provided by reselling another carrier's service; (vii) that are provided over coaxial cable at the end user premises; and (viii) that are provided over fixed wireless at the end user premises. Part II also requires carriers to disclose the number of lines provided to unaffiliated carriers under resold, UNE-loop (with and without switching), and special access arrangements.

## Substantial Competitive Harm from Disclosure

8. The broadband and telephony information discussed above is confidential and competitively sensitive. The public disclosure of that information would threaten AT&T with significant competitive harm.

9. In the broadband market, AT&T competes against an array of aggressive competitors, including not just cable companies, but also competitive DSL providers as well as other providers using different platforms (satellite, fixed wireless). To compete in this market, AT&T employs a range of technologies, and it continues to work to develop additional technologies to meet customers needs. In the Form 477, AT&T must disclose exactly what technologies it is

3

using *by zip code*, and it also must reveal, on a state-by-state basis, not only the volume of customers it is serving, but also how many customers are served using which technologies. This information would be extremely valuable to a competitor. It would show what technologies AT&T is deploying where, which ones are more successful than others, and where AT&T may be migrating its network to new technology. Armed with that information, a competitor could, for example, alter its facilities deployment plans and thereby defeat any advantage AT&T hopes to gain by deploying particular technology in a given market. In addition, a competitor could devise marketing strategies that seek to highlight perceived advantages it may claim to have over a particular technology AT&T may be employing in a particular market. And a competitor could learn, on an aggregate basis, which technologies have found the most success in the market – information that AT&T has gained only through participating in the market and that is extremely valuable in making deployment and investment plans on a prospective basis.

10. A similar analysis applies to the local telephony information included on the Form 477. The Form 477 includes, for example, information regarding the commercial success of AT&T's CLEC operations in states served by other ILECs, including precise details regarding how AT&T is obtaining that success (*e.g.*, by leasing facilities from an ILEC, or instead deploying its own). That information, in turn, can be used by other competitors seeking to mimic AT&T's success by taking business away from it, or, alternatively, by a carrier seeking to differentiate its service in the marketplace. Either way, the specific insight into AT&T's presence in the marketplace – and the precise type of facilities and service it is using to achieve that presence – is commercially sensitive and would, if made public, cause substantial harm.

11. This concludes our declaration.

4

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

January 8, 2007

_____
[name]

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

January 5, 2007

_____
Robert W. Quinn, Jr.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

January 8, 2007

Rick Welday, Jr.
Chief Marketing Officer -
Consumer