**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Center for Public Integrity, | \| |
| | \| |
| Plaintiff, | \| |
| | \| |
| v. | \| Civil Action No. 06-1644 (ESH) |
| | \| ECF |
| Federal Communications Commission, *et al.*, | \| |
| | \| |
| Defendants. | \| |

## PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff, Center for Public Integrity, respectfully asks the Court to enter summary judgment in its favor, pursuant to Federal Rule of Civil Procedure 56, on the grounds that there is no genuine issue as to any material fact and that Plaintiff is entitled to judgment as a matter of law. Plaintiff opposes Defendants' Motions for Summary Judgment.

Plaintiff submits the accompanying statement of material facts as to which there is no genuine dispute (incorporating Plaintiff's response to Defendants' statements of facts), a memorandum of points and authorities, exhibits, and a proposed order.

Respectfully submitted,

/s/
Peter Newbatt Smith
D.C. Bar #458244
Center for Public Integrity
910 17th Street, N.W., 7th Floor
Washington, DC 20006-2606
202-481-1239
e-mail: psmith@publicintegrity.org

Attorney for Plaintiff

April 3, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Center for Public Integrity, | \| |
| Plaintiff, | \| |
| v. | \| Civil Action No. 06-1644 (ESH) |
| | \| ECF |
| Federal Communications Commission, *et al.*, | \| |
| Defendants. | \| |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**SUMMARY AND BACKGROUND**

The availability of high-speed Internet service, or broadband, is a high priority for leaders of both major parties, as well as the Federal Communications Commission and the communication companies that it regulates.

In 2004, President George W. Bush declared that it was a national priority to spur the development of broadband, or high-speed Internet access. "I'm talking about broadband technology to every corner of our country by the year 2007 with competition shortly thereafter," Bush said on April 26, 2004. The White House, "President Unveils Tech Initiatives for Energy, Health Care, Internet," http://www.whitehouse.gov/news/releases/2004/04/20040426-6.html (transcript).

In his first major policy statement on the subject, FCC Chairman Kevin J. Martin said, "Broadband access is essential to an expanding Internet-based information economy. Creating a policy environment that speeds the deployment of broadband throughout the U.S. is my highest priority as the new chairman of the FCC," Martin said in a Wall Street Journal commentary, "United States of Broadband," July 7, 2005,

http://online.wsj.com/article/SB112070076371879188.html.

Recently, Democratic leaders in Congress, and at the FCC, have endorsed these goals. But they have critiqued the policies of the Bush administration and Martin's FCC. They have focused in on the lack of solid, publicly available information about the true state of broadband competition. The ability to understanding the extent of broadband availability within the United States is a crucial step toward achievement of the president's goal, and that of the FCC Chairman.

"The reality is that America currently suffers from the lack of an overarching broadband plan, a low speed threshold, poor data and threats to the openness of the Internet," Rep. Ed Markey, D-Mass., Chairman of the House Energy and Commerce Subcommittee on Telecommunications and the Internet, said at a hearing on March 14, 2007. Transcript, Federal News Service. "An important step the commission could also soon take to advance our broadband goals would be to revamp its data collection and analysis. We simply need a better and more accurate picture of broadband service in America. This will help policymakers identify solutions and fine-tune remedies for overcoming obstacles in achieving our national goals." *Id.*

Other FCC Commissioners echoed this view. "Perhaps the first step in developing a national broadband strategy is to develop more granular broadband data to identify where the problems lie and how best to craft solutions," said FCC Commissioner Michael Copps. "There are folks in far-off places like Japan and a few right here at home like in Kentucky that are doing this. I hope the committee will push the commission to develop better data, propose creative solutions and be more proactive in working with you to develop a broadband strategy for the 21st century." *Id.*

"We can start by improving our data collection to better ascertain our current problems and develop better responses," said FCC Commissioner Jonathan Adelstein. *Id.*

"The FCC doesn't even have a good measure for which areas of the country have broadband," added Rep. Lois Capps, D-Calif. "The commission is still using a measure based on broadband availability to one customer in a ZIP code, which is deceptive on the face of it, because, as you know, ZIP codes can be quite large geographic areas, covering almost entire states, some of them …. My question to you is, why hasn't the FCC done more to make sure it knows which areas need service? Does the fact that there is one broadband subscriber within an entire ZIP code mean that that ZIP code is being served?" *Id.*

"No, it doesn't mean -- the fact that one subscriber in an entire ZIP code being served doesn't mean that they're all being served," Martin replied. "And actually, I agree with many of the concerns and have when I was a commissioner spoken out about the concerns I have with the way we collect data on ZIP codes and the fact that the speed of only 200 kilobits being counted as broadband is insufficient with the technology changes." *Id.*

"I have spoken with the chairman's office about just this and I think we will all benefit," added Commissioner Robert McDowell. "And we all agree that we need more ways to slice and dice and gather that data and get more details, so I think that will be to everyone's benefit. And I think you probably have agreement that the more data we have in front of us, the better." *Id.*

Publicly identifying the companies that provide broadband service would help give citizens a more complete understanding of who they could turn to for high-speed access — which is becoming increasingly important in economic development and the spread of information. The availability of competitive broadband service is an issue involved in a range of telecommunications policy debates.

The agency defendant, Federal Communications Commission ("the FCC"), examines broadband deployment by collecting FCC Forms 477 ("Local Telephone Competition and

Broadband Reporting") from broadband providers. Plaintiff's ongoing project on the political influence of the telecommunications and media industries, "Well Connected," has published an Internet-based searchable database of the radio, television, newspaper and cable companies reaching any particular zip code. Plaintiff plans to add broadband to its Media Tracker database, which is available online at http://www.publicintegrity.org/telecom. This will aid in the nation's understanding of the extent of broadband availability.

In a report released in May 2006, the Government Accountability Office discussed "information [received from the FCC] on the companies providing broadband service in zip codes throughout the United States." *Telecommunications: Broadband Deployment Is Extensive Throughout the United States, but It Is Difficult to Assess the Extent of Deployment Gaps in Rural Areas*, GAO-06-426, http://www.gao.gov/new.items/d06426.pdf, at 49. The GAO's analysis of this FCC Form 477 data allowed them to conclude that the median number of broadband providers within a zip code was two, rather than eight, as was found by the FCC's own analysis of its data. *Id.*, at 17-18.

# ARGUMENT

## I.  STANDARD OF REVIEW

In a case under FOIA, the Court "shall determine the matter de novo," and "the burden is on the agency to sustain its action."  5 U.S.C. § 552(a)(4)(B).  In addition, "[i]t is well settled in Freedom of Information Act cases as in any others that '[s]ummary judgment may be granted only if the moving party proves that no substantial and material facts are in dispute and that he is entitled to judgment as a matter of law.'"  Founding Church of Scientology v. Nat'l Security Agency, 610 F.2d 824, 836 (D.C. Cir. 1979), quoting National Cable Television Assoc. v. FCC, 479 F.2d 183, 186 (D.C. Cir. 1973).  "The party seeking summary judgment has the burden of showing there is no genuine issue of material fact, even on issues where the other party would have the burden of proof at trial, and even if the opponent presents no conflicting evidentiary matter.  '[T]he inferences to be drawn from the underlying facts … must be viewed in the light most favorable to the party opposing the motion.'"  United States v. General Motors Corp., 518 F.2d 420, 441 (D.C. Cir. 1975), quoting United States v. Diebold, 369 U.S. 654, 655 (1962).  Summary judgment is inappropriate "when the litigants quarrel over key factual premises for a determination" regarding "the probable consequences of releasing particular information."  Washington Post Co. v. Department of State, 840 F.2d 26, 30 (D.C. Cir. 1988), *vacated*, 898 F.2d 793 (D.C. Cir. 1990).  Even so, "a motion for summary judgment adequately underpinned is not defeated simply by bare opinion or an unaided claim that a factual controversy persists."  Alyeska Pipeline Serv. Co. v. EPA, 856 F.2d 309, 314 (D.C. Cir. 1988).

## II.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

Defendant FCC has conceded that Plaintiff has exhausted its administrative remedies (FCC's Memo, at 4), but other Defendants and Amici contest this point. Even though it is questionable whether intervening, non-government parties have standing to assert this objection,

5

Plaintiff has submitted with this motion a declaration that establishes that it did constructively exhaust its administrative remedies, as provided by the statute, 5 U.S.C. § 552(a)(6)(C)(i), prior to filing this lawsuit.

### A.  The Agency Has Conceded Constructive Exhaustion and Waived Any Objection.

The FCC's Memorandum, at 4, concedes that "plaintiff has constructively exhausted its administrative remedies." Other parties have no cognizable interest in the administrative exhaustion issue. A primary purpose of the exhaustion requirement is to permit "the top managers of an agency to correct mistakes made at lower levels and thereby obviate[] unnecessary judicial review." Oglesby v. United States Dep't of the Army, 920 F.2d 57, 61 (D.C. Cir. 1990). This purpose would not be advanced by allowing third parties to contest the exhaustion issue when the agency declines to assert it.

Exhaustion is not an element of subject-matter jurisdiction. Although "[e]xhaustion of administrative remedies is *generally* required before" going to court (Wilbur v. CIA, 355 F.2d 675, 677 (D.C. Cir. 2004); Oglesby, 920 F.2d at 61 (D.C. Cir. 1990) (emphasis added)), this is a prudential doctrine, not a jurisdictional prerequisite (*see* Wilbur, 355 F.2d at 677, citing Hidalgo v. FBI, 344 F.3d 1256, 1258-59 (D.C. Cir. 2003)). Thus there should be no bar to an agency's waiver of administrative exhaustion.

### B.  Plaintiff Submitted Its Request More than 20 Working Days Prior to Filing Suit.

Plaintiff's FOIA request was delivered by hand to the offices of defendant FCC on August 24, 2006. Declaration of Brendan McGarry. Benish Shah, an employee in the Office of the Managing Director, accepted delivery of the request and signed and dated a receipt copy. *Id.*; The original also apparently bears her signature and the date received, "8/24/06." *See* the FOIA Request, Attachment A to the Declaration of Alan I. Feldman.

6

The twentieth working day[1] following August 24 was September 22, 2006. Plaintiff filed its Complaint on September 25, 2006.

Certain Defendant-Intervenors and Amici claim that the FOIA Request was addressed to the wrong office within the FCC and that it was not properly received until August 29, 2006. AT&T, *et al.*'s Memo at 2 n.4; CTIA's Memo, at 4 n.7.

The supposed defect in the address on the FOIA Request is hair-splittingly trivial. The FCC's Web site states that FOIA requests may be mailed to

> Federal Communications Commission
> 445 12th Street, S.W., Room 1-A836
> Washington, D.C. 20554

http://www.fcc.gov/foia/. The Commission's regulations specify that "[FOIA] [r]equests shall be delivered or mailed to the Managing Director," no address specified, or sent by e-mail or facsimile. 47 C.F.R. § 0.461(d)(1). The Center's FOIA Request, not enclosed in an envelope, was addressed on its first page to

> Shoko B. Hair
> FOIA Public Liaison
> Office of the Managing Director
> Federal Communications Commission
> Room 1-A836
> 445 12 Street, S.W.
> Washington, D.C. 20554

McGarry Decl. Shoko B. Hair is the FCC's FOIA Public Liaison (*see* http://www.fcc.gov/foia/) and is listed by the U.S. Department of Justice (http://www.usdoj.gov/oip/foiacontacts.htm) as the FCC's "principal FOIA contact[]," with the title of "FOIA Officer."

Given the facts specified here and in the McGarry Declaration, Plaintiff submits that Shoko B. Hair had actual or apparent authority to receive a FOIA request on behalf of the FCC and its managing director; and that Benish Shah had actual or apparent authority to receive the

---

[1] Excluding Saturdays, Sundays, and the Labor Day holiday. *See* 5 U.S.C. § 552(a)(6)(A)(i).

Center's FOIA Request on behalf of Shoko B. Hair and/or on behalf of the FCC and its managing director. Plaintiff made reasonable efforts to deliver its FOIA request to the proper person and office within the FCC, and the delay between hand delivery on August 24 and the date-stamp on August 29 is not attributable to Plaintiff.

### III.  FOIA EXEMPTION 4

Exemption 4 exempts from mandatory disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  Plaintiff agrees with Defendants that the requested information is "commercial or financial information obtained from a person" within the meaning of Exemption 4.  Therefore the only matter at issue under Exemption 4 is whether the requested information is "confidential."

Likewise, all but one[2] of the other parties have conceded (AT&T, et al.'s Memo, at 10; CTIA's Memo, at 8;  NCTA's Memo, at 7), and Plaintiff agrees, that the requested information was submitted "involuntarily," as that term is applied in Critical Mass Energy Project v. NRC, 975 F.2d 871 (D.C. Cir. 1992) (en banc), and in subsequent cases.  Therefore, the standard of National Parks & Conservation Ass'n v. Morton, 498 F.2d 765 (D.C. Cir. 1974), governs whether the requested information is "confidential": the agency has the burden of showing that disclosure is likely to either (i) impair the government's ability to obtain necessary information in the future or (ii) cause substantial harm to the competitive position of the person from whom the information was obtained.  498 F.2d at 770.

### A. The FCC Has Not Addressed Whether Portions of Each Form 477 Submission are Segregable and Nonexempt.

---

[2] WCA takes the position that "most Form 477 filings are mandatory, but there may also be some voluntary filers of Forms 477 as well." WCA's Memo, at 8.

FOIA requires that "any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). The FCC has taken the position that no portion of the requested information can be released, but has presented arguments only against releasing information from some providers and not from others. FCC's Memo, at 28-32. Plaintiff believes that it would be more fruitful to examine the different categories of information that providers submit on the different portions of Form 477, to determine whether each category is exempt. It seems that these categories would be easily segregable from each other, and Defendants have not suggested otherwise.

In its original request, the Center stated, "If it is not possible to produce all the fields in the database, we are willing to negotiate to narrow the scope of this request." Feldman Attachment A, at 2. The Center repeated this willingness in its administrative appeal, and explicitly asked the FCC to "consider whether most or some fields can be released without causing competitive harm if certain other fields are withheld as exempt." Feldman Attachment C, at 2.

Because the disclosure of different data fields entails diverse considerations of confidentiality, potential competitive harm, and potential impairment of government interests, different segments of the data are discussed in turn below. As discussed below in relation to Parts I through IV of Form 477, Plaintiff will not insist on the disclosure of precise connection, line, or subscriber numbers if those numbers can be redacted and replaced by ranges.

**B. The Cover Page of Form 477 Contains No Competitively Sensitive Information.**

The information submitted on the cover page of Form 477 consists of (1) "Company [name]," (2) whether the form reports "data for ILEC or non-ILEC operations," (3) "parent or controlling entity," (4) "State," (5) "Contact person," (6) "Contact person telephone number and email address," (7) "whether this is an original or revised filing," and (8) "whether you request

9

non-disclosure of some or all of the information in this file because you believe that this information is privileged and confidential an public disclosure of such information would likely cause substantial harm to the competitive position of the filer." Form 477; see Attachment D to the Feldman Declaration, at 18.

None of this information could cause competitive harm if released. Defendants have not presented any arguments to the contrary, but yet the FCC has refused to release this information. Defendant-Intervenor WCA apparently concedes that this information should be disclosed, arguing only that "the information called for on FCC Form 477 *after the cover page*" is exempt. WCA's Memo, at 6 (emphasis added).

### C. Parts I through IV Can Be Redacted to Avoid Exemption 4 Concerns.

On Parts I through IV of Form 477, filers submit information on "Broadband" (Part I), "Wireline and Fixed Wireless Local Telephone" (Part II), "Mobile Local Telephone" (Part III), and "Explanations and Comments" (Part IV). They provide statewide totals of the number of connections, lines and channels, or subscribers associated with different types of service, as well as percentages of those totals that are within certain other categories (e.g., residential service, and different ranges of information transfer speed).

#### 1. Use of Ranges is an Appropriate Method of Redacting Numbers.

In its administrative appeal, the Center asked the FCC to "consider whether particular numbers can be redacted by indicating a range that the number falls within (e.g., 0, 1-100, 101-1000, etc.) or, at a minimum, by indicating whether the number is zero or greater than zero." Attachment C to the Feldman Declaration, at 2. Even with such redactions, the information would generally be usable for the purposes the Center intends. Therefore, Plaintiff will not insist on production of unredacted numbers from Parts I through III. Likewise, since some of the comments and explanations in Part IV presumably discuss exact numbers, Plaintiff will not insist

on production of the text of any of the Part IV comments, but only the "part" and "line" numbers indicating which figures may be subject to some qualification.

Redacting these numbers and replacing them with ranges would place a minimal burden on the FCC. It could be accomplished by automated processes and therefore would require much less effort than the line-by-line review of pages of text that agencies routinely conduct to comply with FOIA. In <u>Trans-Pacific Policing Agreement v. U.S. Customs</u>, 177 F.3d 1022 (D.C. Cir. 1999), in which it was not seriously disputed that disclosure of ten-digit Harmonized Tariff Numbers would likely cause serious competitive harm, the Court of Appeals nevertheless remanded for consideration of whether the first four or six digits could be released, with the remaining digits redacted. Replacing precise numbers with ranges would be no more burdensome or unreasonable. In fact the two methods are functionally equivalent in some instances – for example, redacting the last three digits of a number is equivalent to placing it within a one-thousand-wide range.

While the FCC's obligation under FOIA to consider redactions is clear, and its failure to do so is manifest,[3] the appropriate remedy is less clear. Whatever ranges might be used in this case would limit the agency's discretion in how to release the same information to other requesters because comparison of overlapping ranges could reveal the numbers with more precision than intended. Therefore, Plaintiff suggests that this precise issue be committed to the FCC in the first instance, with the agency ordered to release the data from Parts I, II, and III in the form of ranges as narrow as possible without causing substantial competitive harm, subject to review by the Court.

**2. Appropriate Ranges Can Be Crafted to Avoid Competitive Harm.**

---

[3] While the FCC has considered and rejected segregating each filing according to whether the submitter claimed confidentiality (see FCC's Memo, at 28-32), this cannot relieve it of the responsibility also to consider other redaction schemes that are obvious or that have actually been suggested.

11

Before the Commission finally adopted the Form 477 data collection program, it had proposed public release of all the information collected. Local Competition and Broadband Reporting, CC Docket No. 99-301, Report and Order, 15 FCC Rcd 7717 (2000), http://hraunfoss.fcc.gov/edocs_public/attachmatch/FCC-00-114A1.pdf ("2000 Data Gathering Order"), at ¶ 86. In response to comments it received, the Commission deferred any decision on public release, while "continu[ing] to believe that the value of this data collection is significantly enhanced by making as much information as possible available to the public." Id., at ¶ 87.

In the present case, the FCC has not pointed to any new evidence that justifies its change in position.

D. **Part V ZIP Code Information Is Nonexempt.**

In Part V, the filer lists the ZIP codes in which it offers the broadband or telephone services listed in Parts I and II (but not the mobile telephone services listed in Part III).

1. **Information about providers' service areas, including ZIP code information, is customarily public.**

While Defendants must show that the requested information is "confidential" under the National Parks standard – that disclosure is likely either to impair the Government's interests or to cause substantial competitive harm to the submitters (*see* 498 F.2d at 770) – in this case they cannot meet even the lesser burden (applicable where information is submitted voluntarily) of showing that all the requested information "is of a kind that would customarily not be released to the public." Critical Mass, 975 F.2d at 879. *See also* CNA Financial Corp. v Donovan, 830 F.2d 1132, 1154 (D.C.Cir. 1987) ("To the extent that any data requested under FOIA are in the public domain, the submitter is unable to make any claim to confidentiality.").

Broadband and telephone service providers do release to the public information about the geographic areas they service. First of all, it is self-evident that each customer knows that his or her particular service provider operates in that customer's ZIP code area. In addition, service

12

providers routinely inform potential customers of the services offered in their area. Indeed, every one of the ten largest broadband providers prominently feature some type of ZIP code search function on their Web sites to inform the public what services they offer in particular locations. *See* Web page images contained in Exhibit 2.[4]

In <u>Sharyland Water Supply Corp. v Block</u>, 755 F.2d 397 (5th Cir. 1985), the plaintiff non-profit water supply company sought to prevent the release under FOIA of its audit reports. Noting that state law required the reports to be made available to the company's 5200 members, the appellate court upheld the "conclusion that what five thousand people may obtain without even a pledge of nondisclosure is not confidential." *Id.* at 399. Likewise, in the present case, what customers and even non-customers can easily learn about a provider's geographic service area – e.g., its presence in a particular ZIP code – cannot be considered confidential.

The Instructions for Form 477 provide that Line V-1, column (g), for terrestrial mobile wireless broadband connections, should contain "the Zip codes in the state in which the mobile wireless broadband service provider's service is *advertised* and available to actual and potential subscribers." Feldman Attachment D, at 10 (emphasis added). Implicit is the reasonable assumption that providers advertise within the ZIP code areas where they make their services available. Information advertised to the public is, *per se*, not confidential.

**3. Disclosure is unlikely to cause substantial competitive harm.**

The FCC already makes available similar information for the cable industry, listing all providers with the county and communities, though not the ZIP codes, where they provide

---

[4] Ten largest broadband providers (Comcast Corp. (including former Adelphia Communications), AT&T Inc., Verizon Communications Inc., Time Warner Inc., BellSouth Corp. (merged with AT&T Inc.), Cox Communications, Charter Communications, Cablevision Systems Corp., Qwest communications International Inc., and Bright House Networks) are those identified by the Center for Public Integrity's research, see http://www.publicintegrity.org/telecom/rank.aspx?act=industry#9, based on 2006 subscriber figures obtained from Kagan Research (cable) and Leichtman Research Group (telecom).

service.[5] Particularly since there is significant overlap between the companies providing broadband service and those providing cable, there is no apparent reason why completely different disclosure schemes should apply apparent reason why completely different disclosure schemes should apply. If the FCC has been disclosing the service areas of cable providers without causing competitive harm, then it should be able to disclose similar information for broadband and telephone service providers as well.

4.  **Disclosure will not impair the Government's ability to obtain accurate information.**

Defendants assert that, even in the absence of competitive harm, disclosure of the Form 477 data would make providers reluctant to provide complete and accurate information in future submissions. Providing this information is mandatory. It is odd enough that the FCC posits that companies would break the law to serve no business purpose. But the intervening Defendants and Amici are in the even stranger position of arguing that the members of their trade associations – or other, identically situated companies – can be expected to break the law if they do not get their desired outcome in this case.

The FCC has cited (FCC's Memo at 18) Judicial Watch v. Export-Import Bank, 108 F. Supp. 2d 19 (D.D.C. 2000), and Comstock Int'l, Inc. v. Export-Import Bank, 464 F. Supp. 804 (D.D.C. 1979), in support of its position. In each of those cases, the court found that "potential loan applicants might seek financing outside of the United States because of their unwillingness to subject themselves to the possible risk of disclosure." Comstock Int'l, 464 F. Supp. at 808 (and see similar finding in Judicial Watch, 108 F. Supp. 2d at 30).

The present case is much different. The FCC does not have foreign competitors who can offer to regulate broadband and telephone companies (in the U.S. market) on more convenient

---

[5] *See* http://www.fcc.gov/mb/vax/registeredcuid.xls (large Excel-format file, 13MB); or *see* state-specific data linked from http://www.fcc.gov/mb/engineering/liststate.html.

14

terms. Whatever the outcome in this case, all service providers will be subject to the same generally applicable rules governing the submission and disclosure of Form 477 information. Defendants have not offered any evidence or argument that service providers would withdraw from market competition because of an aversion to disclosure, and such a conclusion would not be credible.

Contrary to its current argument, in its 2000 Data Gathering Order, at ¶ 86, the FCC stated that "public availability allows consumers and experts the opportunity to review the data to ensure the accuracy of the information." That is, disclosure would *increase* the accuracy of the data collected. This is especially the case where FOIA requesters, such as Plaintiff, wish to disseminate this information to the public. If Form 477 data is incorporated into Plaintiff's Media Tracker database (http://www.publicintegrity.org/telecom/), consumers will be easily able to examine the information pertaining to their locality and then could inform the submitter or the FCC of discrepancies.

### E. Associated Documentation

In addition to the database of Form 477 data, Plaintiff also requested "[a]ll documentation associated with that database." The next paragraph repeated that the Center was requesting "any and all documentation related to these records, including but not limited to data dictionaries, database documentation, record layouts, data entry instructions and similar printed or electronic documentation materials." Feldman Attachment A, at 1. Plaintiff further clarified, in its administrative appeal, that it does not seek all documents associated with the database, but "documentation associated with the structure of the database, not with its contents." Feldman Attachment C, at 2-3.

Defendants have presented no argument that disclosure of technical information about the structure of the FCC's Form 477 database would cause competitive harm to the submitters.

15

                                    Respectfully submitted,

                                    /s/
                                Peter Newbatt Smith
                                D.C. Bar #458244
                                Center for Public Integrity
                                910 17th Street, N.W., 7th Floor
                                Washington, DC 20006-2606
                                202-481-1239
                                e-mail: psmith@publicintegrity.org

                                Attorney for Plaintiff

April 3, 2007