UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR PUBLIC INTEGRITY, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>FEDERAL COMMUNICATIONS )<br>COMMISSION *ET AL.*, )<br>)<br>Defendants. )<br>_____) | Civil Action No. 06-1644 (ESH) |

## SUPPLEMENTAL DECLARATION OF ALAN I. FELDMAN

1.　I am presently employed as Acting Chief, Industry Analysis and Technology Division ("IATD"), Wireline Competition Bureau ("WCB"), Federal Communications Commission ("FCC" or "Commission"). I have served in that capacity and as a Deputy Division Chief in IATD since the FCC Form 477 was implemented in March 2000, and have been with WCB and its predecessor, the Common Carrier Bureau, since May 1971.

2.　The information set forth in this Supplemental Declaration is based upon my official knowledge acquired in my management positions in IATD, WCB, FCC, and supplements the Declaration that I executed in this case on January 8, 2007.

3.　The information contained on the Form 477 cover pages, standing alone, neither reflects what services a particular company provides, nor the ZIP Code where it provides them. Boxes 5-6 of the cover page contain the name, telephone number, and e-mail address of the individual who prepared the Form 477 data for submission to the FCC. Release of this information would constitute an unwarranted invasion of personal privacy particularly with respect to the approximately 74% of filers who requested confidential treatment of their Form 477 submissions. This is particularly true with respect to smaller service providers (such as wireless ISPs), which may be single proprietorships. Releasing contact information for such entities could effectively release home phone numbers and e-mail addresses. The information contained in boxes 5-6 of the cover page should thus be withheld from disclosure pursuant to FOIA Exemption 6.

4.　The information contained in boxes 5-6 of the cover page could also be competitively sensitive. When service providers have few customers, the area code and exchange of the phone number may effectively identify the geographic location where that provider offers service, and therefore where its customers are located, with as much if not more precision than the ZIP Code information contained in Part V of the Form 477. The information contained in boxes 5-6 of the cover page should thus be withheld from disclosure also pursuant to FOIA Exemption 4.

5. The remaining information contained on the 35,000 Form 477 cover pages (other than boxes 5-6) is not exempt from disclosure under FOIA. All of this information is contained in the FCC's electronic databases and can be released to plaintiff. The FCC can readily extract this information and provide it to plaintiff in electronic form.

6. The "part" and "line" numbers from Part IV of the Form 477, standing alone, neither reflect what services a particular company provides nor the ZIP Code where it provides them.

7. The "part" and "line" numbers from Part IV are not exempt from disclosure under FOIA. To the extent that the data from Part IV of the 35,000 Forms 477 has been entered into the FCC's electronic databases, the "part" and "line" numbers are segregable and may be disclosed. This applies to approximately 14,300 Forms 477, covering the reporting periods June 2005 through June 2006. FCC staff would have to perform some manual review prior to disclosure to ensure that the proper information was captured. This could take several weeks, depending upon staffing resources and other FCC mission-critical duties.

8. With respect to the remaining approximately 20,700 Forms 477 (covering the reporting periods December 1999 through December 2004) for which the data from Part IV is not entered into the FCC's electronic databases, FCC staff would need to create new computer code that would read in the cells on the more than 20,000 original EXCEL filings that contain the "part" and "line" numbers for each comment and put it into a separate and new database. The new computer software would also need to pull information from these EXCEL filings that would uniquely identify information by company, state, regulatory status, and the date of the data collection. FCC staff would then need to manually review all of the information to ensure that it is comprehensive and matches the filings at issue. The foregoing process could take four to six weeks if a staff member was able to devote his or her full time to the task, which is unlikely. The "part" and "line" numbers from Part IV of these 20,700 forms are thus not reasonably segregable from the remaining information contained in Part IV or in the other sections of the Form 477.

9. With respect to Parts I through III of the 35,000 Forms 477 at issue, replacing the actual numbers contained therein with number ranges would require the FCC to first decide upon an appropriate range for each number, then redact each number, and finally replace each number with the appropriate range. As an initial matter, the FCC would be required to decide upon an appropriate range for each of the more than 100 numbers in Parts I through III of the Forms 477. Ascertaining appropriate ranges in and of itself would be extremely difficult because the appropriate scales of the data fields can be vastly different. For example, as of June 2006, the total number of asymmetric DSL (aDSL) connections by state, as reported by the FCC based on Form 477 data, ranged from 32,763 in South Dakota to 4,001,529 in California, and the number of cable modem connections ranged from 19,861 in North Dakota to 2,956,932 in California. The FCC would be required to write two separate software programs to perform the redaction and

replacement tasks for the current version of the form and for the version used prior to 2005.

10. The tasks described in ¶ 9 would be akin to creating 35,000 new "Forms 477" containing number ranges rather than actual numbers. The FCC has identified no need or use for records containing ranges instead of actual numbers for Parts I through III, and would be creating any such records solely for purposes of responding to plaintiff's FOIA request.

11. Using ranges instead of actual numbers for Parts I through III would still reveal competitively sensitive information. The extent to which competitively sensitive information is revealed would depend upon the design of the range structure. If the size (or width) of the ranges was small, disclosing the range for a particular company would be tantamount to releasing the exact number. For example, if Company X reported 45,342 aDSL lines in Virginia and the ranges were constructed over 5,000 line intervals, revealing that Company X has 45,000 to 50,000 aDSL lines in Virginia is essentially the same as revealing the exact number.

12. Using even the largest range possible, zero/non-zero indicators, would still reveal competitively sensitive information, such as purchased-connection speeds, customer mix, and deployment strategy by technology and the extent of reliance on filer-built versus leased facilities. A competitor could use that information to target particular customer segments, or even particular business customers of smaller entities, and to ascertain details of new technology deployments, particularly by smaller entities. For example, if Company X has 50 aDSL lines in Virginia, it would be required to report this figure in Part I of the Form 477. Even if each line item in Part I was released as either 0 or more than 0, it would still be revealed to Company X's competitors that Company X had some non-zero number of aDSL lines in Virginia. Competitors would be able to discern from the remainder of the information contained in Part I the particular technologies that Company X is using to deploy broadband Internet access service in Virginia. The information provided by Company X in columns (b) through (j) in Part I of the Form 477 (released also as 0 or more than 0) would reveal to competitors whether any of Company X's aDSL lines are residential, if any are over their own facilities, and into which speed-tiers the lines fall.

13. Of particular value to Company X's competitors would be the ability to see how this data changes over time. For example, if Company X secured a new business contract in North Carolina in 2006, it would be required to file a Form 477 for that state showing in column (a) in Part I that it is providing a certain amount of symmetrical DSL (sDSL) lines; in column (b) that 0% of the lines are residential; in column (c) that 0% of the lines are over Company X's own facilities; in column (d) that 100% of the lines are billed to Company X; and in column (f) that 100% of the lines have information transfer rates between 200 kbps and 2.5 mbps. Even if the ranges used for releasing the data were 0 versus more than 0, the data would show that Company X picked up some sDSL lines in North Carolina, that they are business lines, that they are provisioned over "local loop" facilities leased by Company X from an unaffiliated carrier and that they are all 200 kbps – 2.5 mbps. It would thus be clear to Company X's competitors that Company

3

X landed the contract, what technologies were used to provide the service, what speed tier the service falls into, and that Company X is using leased facilities from an unaffiliated carrier to provide the service. All of the foregoing information is competitively sensitive.

14. The information contained on Part V of the Form 477 is based on and linked to other parts of the Form 477 because filers report a ZIP Code only when one or more of the subscribers reported in Part I or Part II of the form are located in that ZIP Code. Taken as a whole, this data indicates what type of broadband connections – by technology – a particular provider has in service in particular ZIP codes.

15. Part V of the Form 477 reflects where providers actually have customers – not where they merely offer to provide service (with the exception of mobile wireless broadband providers, which are required to report ZIP codes that best represent their service roll-out areas). The ZIP codes in which a service provider offers service are not necessarily the same ZIP codes in which it actually has current customers.

16. As described in my January 8, 2007 Declaration (at ¶¶ 27-28), certain of the confidentiality concerns associated with the Form 477 data arise specifically because the data reveals where companies have or have not actually acquired customers, as opposed to merely indicating where they offer service. Disclosure of Part V of the Form 477 could, when correlated with other parts of the form, allow competitors to determine the areas where companies have or have not acquired customers or allow competitors to determine the structure of competition, for example if a provider has succeeded in obtaining customers in only part of the area they serve.

17. As described in my January 8, 2007 Declaration (at ¶¶ 30-33), certain of the confidentiality concerns associated with the Form 477 data arise specifically because disclosure would reveal information about new market entrants. The actions of a few large, well-established market competitors do not address the competitive harm associated with the disclosure of data for other smaller companies, for which the areas where they offer service might be much broader than the areas where they have customers. Disclosure of Part V of the Form 477 could allow competitors already serving particular markets to respond to new entry or allow other competitors to free ride on the efforts of the first new entrants to identify areas where competition is more likely to be successful.

18. The printouts from the websites of certain large broadband providers that plaintiff attached to its cross-motion all appear to relate to cable modem service or residential DSL service. Certain of the confidentiality concerns associated with the Form 477 data arise specifically because the nature of the technology used reveals competitive information. Technology-specific data can, for example, reveal information about the services offered to business, government, or institutional users that would allow competitors to target those customers.

19. The cable industry information to which plaintiff refers (at the bottom of pages 13-14 of the cross-motion) that is released by the FCC does not reveal any comparable details about the service(s) offered by those providers. Similarly, the FCC Media Bureau source to which plaintiff cites (at page 14, n. 5 of the cross-motion) provides information only about which communities have a cable TV system. Not all cable TV systems provide cable modem service, and not all systems with cable modem service provide it everywhere in the franchise area. Moreover, the "operator address" information that is provided for the community (including ZIP Code) is typically a corporate or regional headquarters, which may actually be in a different state.

20. Because the FCC releases aggregate data, there are concerns about the effects of releasing one company's data on the continued confidentiality of the data of other companies serving that same area. Release of one filer's data could, when associated with publicly-available information, reveal market-specific information about data from filers that sought confidential treatment. Thus, even assuming *arguendo* that ZIP Code data for certain service offerings of certain large companies were not confidential, the Commission could not release those data without going through the burdensome process described in my January 8, 2007 Declaration (at ¶¶ 36-42).

21. The Commission recently issued a NPRM regarding its collection and use of the broadband data collected on the Form 477. Resolution of the instant litigation could affect the manner in which the FCC collects Form 477 data on a going-forward basis. If the Commission were required to disclose the information collected on the Form 477, it could in turn decide to scale back the information it presently collects. This would significantly diminish the FCC's ability to (1) develop, evaluate, and revise policy in the rapidly changing areas of development of local telephone service competition and the deployment of broadband services by providing valuable benchmarks for Congress, the Commission, other policy makers, and consumers; (2) evaluate the Commission's and states' efforts to reduce economic and operational entry barriers into previously monopolized local telecommunications markets; (3) assess the availability of broadband services (such as high-speed Internet access) to better satisfy its duty to encourage the deployment of advanced telecommunications capability as required by section 706 of the 1996 Act; and (4) achieve the complementary goal reflected in the 1996 Act of reducing government regulation whenever possible.

22. The FCC possesses no records containing "technical information about the structure of the FCC's Form 477 database."

23. Pursuant to 28 U.S.C. § 1746, I, Alan I. Feldman, declare under penalty of perjury that the foregoing is true and correct. Executed on this 15th day of May, 2007.

Alan I. Feldman